UNITED STATES of America,
Plaintiff–Appellant,

v.

Edward H. HELLER and Robert M.
Adler, Defendants–Appellees.

No. 87–5105.

United States Court of Appeals,
Eleventh Circuit.

March 2, 1989.
Rehearing and Rehearing In Banc
Denied April 10, 1989.

Dexter W. Lehtinen, U.S. Atty., Miami, Fla., John J. Klein, Criminal Div., Fraud Section, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellant.

Theodore J. Sakowitz, Federal Public Defender, Victor Martinez, Asst. Federal Public Defender, for Heller.

William W. Taylor, III, Zuckerman, Spaeder, Goldstein, Taylor & Kolker, Washington, D.C., for Adler.

Before FAY and KRAVITCH, Circuit Judges, and LYNNE *, Senior District Judge.

KRAVITCH, Circuit Judge:

The government charged appellees Edward H. Heller and Robert M. Adler with having devised and implemented fraudulent tax shelters. A grand jury indicted Heller, the promoter, and Adler, a lawyer alleged to have given misleading advice in connection with the shelters, on five counts of mail fraud (18 U.S.C. § 1341) (counts one through five). Heller was also indicted on four counts of transporting fraudulently obtained property through interstate commerce (18 U.S.C. § 2314) (counts six through nine),[1] and on two counts of making false statements on his income-tax returns (26 U.S.C. § 7206(1)) (counts ten and

eleven). Both appellees moved to dismiss the indictment pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, and after an evidentiary hearing, the district court struck portions of the indictment against Heller and dismissed the entire indictment against Adler. On the government's petition for interlocutory review pursuant to 18 U.S.C. § 3731, we reverse.

I.

Heller and Adler designed a series of limited partnerships which, if they functioned as represented, would have generated tax deductions for the limited partners in excess of any cash contributions a limited partner made to his partnership.[2] This appealing result, referred to by the government as a "two for one" loss, was accomplished with a byzantine financial transaction the workings of which are largely undisputed. Simply stated, the plan was supposed to have worked as follows: Heller would create a series of limited partnerships for the ostensible purpose of buying and selling shrubbery. The general partner of each limited partnership was a corporation under Heller's control. To fund the partnerships, each limited partner would contribute cash and promissory notes. The basis of a limited partner's interest in his partnership would be his cash contribution; the value of any promissory notes would not be included in basis.

To avoid the rule excluding the promissory notes from basis, Fin Serve (another entity under Heller's control) would loan to each partnership cash equal to the amount of any promissory notes that had been contributed to that partnership. The promissory notes from the limited partners served as collateral for this loan from Fin Serve. Each limited partner's basis in his partnership interest would then increase by his pro

---

* Honorable Seybourn H. Lynne, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

1. Counts 1–9 also carried an aiding-and-abetting charge (18 U.S.C. § 2).

2. We take the government's allegations in the indictment to be true; we are only concerned with whether the indictment charges an offense.

*United States v. Mann,* 517 F.2d 259, 266 (5th Cir.1975) (binding authority in the Eleventh Circuit through *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (in banc)), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976). In particular, we intimate no opinion whether Heller or Adler made false representations with fraudulent intent; these are questions to be resolved at trial. *Mann,* 517 F.2d at 267.

rata share of the partnership's obligation to repay Fin Serve. Thus, at the close of this stage of the scenario the partnerships had cash on hand equal to the total cash contributions plus the value of the promissory notes, and each limited partner had a basis in his partnership equal to the amount of his cash contribution plus any promissory note he had contributed to the partnership.

The partnerships would then use this cash to purchase commitments for shrubbery from Island Foliage, a shrubbery broker (and yet another entity under Heller's control).[3] The partnerships would book this transaction as a cash disbursal and partnership business expense, and each limited partner would be able to deduct his pro rata share of the expense. Because the loan from Fin Serve corresponded to the limited partners' promissory notes, each limited partner would thus be able to deduct an amount equal to his cash contributions plus any promissory note he contributed to his partnership. For example, if a limited partner contributed one dollar in cash and a one dollar promissory note, he would be able to deduct two dollars as his share of the partnership's business expense. The partnerships would not receive or resell the shrubbery until the next tax year, and therefore would generate no income to offset the expense of purchasing the shrubbery commitments.

Thus seen, Heller and Adler devised an intricate plan to inflate each limited partner's basis in his partnership interest, thereby increasing the share of deductions each could take on his individual income-tax return. Yet the validity of the deductions depends upon the Fin Serve loans: if those loans lacked economic substance, the corresponding increases in basis and individual deductions would not be respected for tax purposes.

3. Adler's analysis of the tax risks failed to note that Heller controlled not only the general partners, but also Fin Serve and Island Foliage.

4. Appellees and the district court attach some significance to the fact that Island Foliage gave a worthless check to Clariden as collateral for the Clariden–Fin Serve loan. As will become apparent, the worth of Island Foliage's check

Clariden, a Swiss bank, loaned the cash to Fin Serve that Fin Serve loaned to the partnerships. This loan, however, was backed by a corresponding deposit Island Foliage made with Clariden (albeit with a worthless check).[4] The arrangement between Clariden and Island Foliage is called a "fiduciary loan." A fiduciary loan is a Swiss practice in which the bank (Clariden) agrees with a principal (Island Foliage) to loan funds to a specified third party (Fin Serve). The fiduciary-loan agreement between Clariden and Island Foliage provided:

*Article 2*

It is agreed that Clariden shall only be obligated to grant the loan provided that the amount of the loan be put at its disposal by the Principal, such amount being credited to a fiduciary account which shall remain blocked for the duration of the loan....

*Article 3*

It is understood that Clariden shall grant the loan in its own name, but in a fiduciary capacity for the exclusive account and risk of the Principal. In particular, Clariden bears no liability nor guarantee whatsoever for the payment of the monies due by the debtor [Fin Serve], be it as loan repayments, interest or for any other cause whatsoever connected with the loan.

. . . . .

*Article 6*

The [P]rincipal agrees and undertakes to hold Clariden harmless for any loss, costs, taxes, expenses or damages whatsoever which Clariden might incur as fiduciary lender pursuant hereto, Clariden bearing no other liability or responsibility than that deriving from a gross negligence.[5]

was irrelevant to the operation of the financing transaction.

5. The fiduciary-loan agreement provides that it is to be construed according to Swiss law. Swiss law, however, does not alter the conclusion drawn from Articles 3 and 6 of the fiduciary-loan agreement that Island Foliage, not Clariden, bears the risk of Fin Serve's non-performance. Indeed, one of appellees' Swiss ex-

Clariden and Fin Serve entered into a separate loan agreement; the principal amount of the Clariden–Fin Serve loan equalled the amount of the Island Foliage–Clariden fiduciary loan.

Appellees put the plan into practice on two occasions described in the indictment; here we discuss the plan as realized on December 17, 1979. Clariden, the partnerships, Fin Serve, and Island Foliage all had accounts at the First National Bank in West Palm Beach, Florida. On December 17, the following transaction occurred: Island Foliage deposited a check for $27,550,-000 into Clariden's account (performing its duty under the fiduciary-loan agreement); Clariden deposited a check for a like amount into Fin Serve's account (fulfilling its duties under both the fiduciary-loan agreement and the Clariden–Fin Serve loan agreement); Fin Serve deposited checks for an aggregate amount of $27,550,000 into the accounts of the several partnerships (consummating the loans to the partnerships); and then, in partial payment for the shrub commitments, the partnerships wrote checks totalling $27,550,000 to Island Foliage.

Heller and Adler thus orchestrated a simple circling of funds from Island Foliage to Clariden to Fin Serve to the partnerships and then back to the coffers of Island Foliage.[6] Prospective investors were led to believe that the loans to the partnerships, used to purchase commitments of shrubbery from Island Foliage, would be treated as cash payments generating deductible business expenses for the limited partners. The government charged that the loan transaction was a sham, incapable of facilitating any tax deduction.

Count one of the indictment alleged in part as follows:

perts opined as follows in response to the government attorney's question:

Q: Now, under the terms of the fiduciary loan agreement, Clariden Bank has an obligation to repay principal to Island Foliage if and only if it receives principal repayment from Fin Serve?

A: Yes.

## OBJECTS OF THE SCHEME

10. The objects of the scheme to defraud of EDWARD H. HELLER and ROBERT M. ADLER were:

a. to defraud citizens throughout the United States by causing them to invest money in tax shelters formed as limited partnerships by falsely, fraudulently and unlawfully representing that the limited partners would be able to claim income tax deductions larger than the amount of cash they invested in the partnerships.

b. to defraud the Internal Revenue Service, an agency of the United States, by impairing, obstructing and defeating its lawful audit and revenue collection function.

Paragraph ten of count one was realleged in each of counts two through eight.

The indictment proceeded to describe the mechanics of appellees' plan. Following is an excerpt from count one of the indictment detailing the plan as executed on December 17, 1979:

27. It was part of the scheme and artifice to defraud that on or about December 17, 1979, EDWARD H. HELLER and ROBERT M. ADLER caused Island Foliage through its agent Clariden Bank of Zurich, Switzerland, falsely and fraudulently *to lend fictitious funds* totalling $27,550,000 to Fin Serve, B.V.

28. It was part of the scheme and artifice to defraud that on or about December 17, 1979, EDWARD H. HELLER and ROBERT M. ADLER caused Fin Serve, Inc.[7] falsely and fraudulently *to lend fictitious funds* totalling $27,550,-000 to nineteen limited partnerships to finance claimed product purchases from Island Foliage.

29. It was part of the scheme and artifice to defraud that on or about December 17, 1979, EDWARD H. HELLER

---

**6.** Of course, this circling of checks would have yielded no funds for Island Foliage to use in purchasing shrubbery from growers. The indictment alleges that Heller caused Island Foliage to create fictitious contracts with growers representing that shrubs had been purchased.

**7.** Fin Serve, Inc. was a wholly owned subsidiary of Fin Serve, B.V.

and ROBERT M. ADLER caused Island Foliage falsely and fraudulently to draw a check for $27,550,000 to Clariden Bank.

30. It was part of the scheme and artifice to defraud that on or about December 17, 1979, EDWARD H. HELLER and ROBERT M. ADLER caused Clariden Bank falsely and fraudulently to draw a check for $27,550,000 to Fin Serv[e], B.V.

31. It was part of the scheme and artifice to defraud that on or about December 17, 1979, EDWARD H. HELLER and ROBERT M. ADLER caused Fin Serve, Inc. falsely and fraudulently to draw nineteen checks totalling $27,550,-000 to the order of nineteen limited partnerships.

32. It was part of the scheme and artifice to defraud that on or about December 17, 1979, EDWARD H. HELLER and ROBERT M. ADLER caused nineteen limited partnerships falsely and fraudulently to draw checks totalling $27,550,000 to Island Foliage.

(Emphasis supplied). The foregoing six paragraphs were realleged in each of counts two through eight.

## II.

Upon a motion to dismiss the indictment, the district court took extensive evidence on the nature of Clariden's loan to Fin Serve. Over the government's relevancy objection, the court heard from several well-credentialed Swiss and American banking experts, and distilled from their testimony two conclusions of law. First, the court determined that as a matter of Swiss banking law, the loan from Clariden to Fin Serve was "real." The court was impressed by the fact that Fin Serve had, under Swiss law, a right to sue Clariden for the $27,550,000 even if Island Foliage did not deposit a like amount into Clariden's account. Second, the court found that the

funds circled among the parties on December 17, 1979, were not "fictitious," but "real." The court based this finding on testimony that banks transfer "real" money through debits and credits, and not in satchels of cash. Concluding, therefore, that paragraphs twenty-seven through thirty-two of count one could not as a matter of law be proven, the court dismissed all counts against Adler, and dismissed counts one through eight against Heller.[8] We review this disposition *de novo*. *Cf. United States v. Irvin*, 787 F.2d 1506, 1511–12 (11th Cir.1986).

■ The district court's findings are irrelevant to the legal sufficiency of the indictment. Heller and Adler were not charged with violating Swiss banking law, or with passing *Monopoly* money among themselves, but with visiting a fraud on limited partners and the Internal Revenue Service by representing that the Fin Serve loans could enable the limited partners to reap a certain tax benefit. Count one of the indictment sets forth plainly this theory of prosecution; the fraud signalled in paragraph ten colors the interpretation of the adjectives "false," "fraudulent," and "fictitious" employed elsewhere in counts one through eight. The indictment thus fairly informs appellees of the charges against which they must defend. *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974); *United States v. Chilcote*, 724 F.2d 1498, 1504 (11th Cir.), *cert. denied*, 467 U.S. 1218, 104 S.Ct. 2665, 81 L.Ed.2d 370 (1984).[9]

### A.

We accept for argument's sake the district court's conclusion that Clariden's loan to Fin Serve was entirely regular as a matter of Swiss law, and that Clariden would have owed $27,550,000 to Fin Serve

---

8. Paragraphs 20–26 & 33 described parts of a similar scheme; these paragraphs were also repeated and realleged in counts 2–8, and were also struck by the district court.

9. We therefore reject the district court's finding that late in the pre-trial maneuvering, "the government suddenly announced its new opinion that the loans were also fraudulent and fictitious because they could not produce the tax consequences described by Adler in his tax opinions." This "new opinion" is fairly stated in the indictment. The district court's acknowledged hunch that this theory must not have been presented to the grand jury is baseless.

regardless of whether Island Foliage performed under the fiduciary-loan agreement. According to paragraph ten in count one of the indictment, Heller and Adler represented that the December 17 transaction would enable the limited partners to realize a certain tax result. Should the jury find that this representation was baseless, and find that appellees acted fraudulently, the jury could find that Heller and Adler defrauded the limited partners and the Internal Revenue Service.

 To amplify, federal tax law disregards transactions lacking an economic purpose which are undertaken only to generate a tax savings. Federal tax law is concerned with the economic substance of the transaction under scrutiny and not the form by which it is masked. *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945); *Gregory v. Helvering*, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596 (1935); *see generally Kirchman v. Commissioner*, 862 F.2d 1486, 1490–94 (11th Cir.1989). If Clariden's participation in the transaction was economically unnecessary, the sundry rights and duties created by Swiss law are without consequence to any federal tax considerations and are therefore irrelevant to the fraud charged in the indictment. The government could argue to the jury, for example, that stripped of the smoke and mirrors, the December 17 transaction yielded nothing but a simple promise on behalf of the partnerships to pay Island Foliage for future deliveries of shrubbery.[10] Thus, the jury could find that by simultaneously recording a debit and a credit for an identical sum of money, Clariden functioned as a conduit between Island Foliage and Fin Serve; Fin Serve could similarly be viewed as a conduit between Island Foliage and the partnerships. The result of the transaction would be a loan from Island Foliage to the partnerships. Of course Island Foliage had no cash to lend (its check to Clariden having been worthless)—but no matter: as the loan was immediately used by the partnerships to purchase future commitments of shrubbery from Island Foliage, the transaction was no different in substance from a promise to pay for those future commitments. No cash payment would have been made in any event.[11]

The partnerships' executory promises to pay Island Foliage for future deliveries of shrubbery would not have generated deductions for the limited partners; the partnerships actually had to pay cash for the shrubs.[12] As we cannot say that a jury would not be justified in finding that the transaction actually created nothing but an executory contract between Island Foliage and the partnerships, the jury could also conclude that Island Foliage's performance under the fiduciary-loan agreement made Clariden's participation in the December 17 transaction economically unnecessary—a sham.[13]

---

**10.** We do not suggest that the government cannot proceed before the jury with a different characterization of the Clariden transaction; the government need only prove that the transaction was a sham.

**11.** Further, as the partnerships simply returned the funds that Island Foliage had previously deposited with Clariden, Island Foliage would have no new funds with which to purchase shrubbery from the growers. This is but one more aspect of the fraud charged in the indictment. *See supra* note 6.

**12.** Adler explained as follows in a private-placement memorandum dated January 12, 1978:

The Nursery and Tree Divisions have adopted the cash method of accounting. Under the cash method, the payments made during the Partnership's current fiscal year for seedlings and bulbs and farming services may be claimed as a deduction in that year. Treas. Reg. 1.162–12(a).

Treas.Reg. § 1.162–12(a) (1972) provides in pertinent part:

A farmer who operates a farm for profit is entitled to deduct from gross income as necessary expenses all amounts actually expended in the carrying on of the business of farming.

**13.** If Clariden's primary responsibility in appellees' plan was to book offsetting debits and credits in its First National account, and appellees did not intend Clariden to risk its own funds (which is certainly a reasonable inference, *see supra* note 5), this is answer enough to appellees' attempts to distinguish the Ninth Circuit cases *United States v. Crooks*, 804 F.2d 1441 (9th Cir.1986) and *United States v. Clardy*, 612 F.2d 1139 (9th Cir.1980). For example, Heller states that "[i]n *Crooks*, ... the parties merely circulated worthless checks among themselves

## B.

■ We will not quarrel with the conclusion that "real" money passed between the parties as a consequence of First National's sequential debits and credits to the accounts of Island Foliage, Clariden, Fin Serve, and the partnerships. Heller and Adler, however, were charged with "falsely, fraudulently and unlawfully representing that the limited partners would be able to claim income tax deductions larger than the amount of cash they invested in the partnerships," and, to that end, causing Clariden and Fin Serve "to lend fictitious funds." If for the purposes of the relevant federal tax law Fin Serve and the partnerships left the table having borrowed no money at all, but Heller and Adler fraudulently had represented the contrary, a jury could find that Clariden and Fin Serve *loaned* "fictitious funds" in spite of their choreographed transfers of "real" money.

## III.

■ For an alternative basis to dismiss portions of the indictment, the district court held as a matter of law that neither Heller nor Adler could have formed the requisite criminal intent: the absence of a prior Internal Revenue Service statement or court opinion condemning schemes precisely like appellees', as well as the conflicting opinions of the experts who testified at the hearing, demonstrated "legal uncertainty" as to the tax consequences of the scheme.

Legal uncertainty in tax prosecutions can derive from arguably conflicting government pronouncements on narrow issues of law. *See United States v. Garber*, 607 F.2d 92 (5th Cir.1979) (in banc) (taxability of income derived from sale of blood antibodies uncertain because of prior permissive opinions of Supreme Court and Attorney General); *and United States v. Critzer*, 498 F.2d 1160 (4th Cir.1974) (taxability of income derived from land held by United States in trust for Native American reservation uncertain because of conflicting statements by administrative agencies). In these cases, conflicting government interpretations yielded impermissibly vague legal rules. Because the government attempted to prosecute its citizens under vague laws, the defendant's subjective intent to engage in prohibited conduct was irrelevant. *Garber*, 607 F.2d at 98; *Critzer*, 498 F.2d at 1162; *United States v. McClain*, 593 F.2d 658, 670 (5th Cir.), *cert. denied*, 444 U.S. 918, 100 S.Ct. 234, 62 L.Ed.2d 173 (1979). *See United States v. Burton*, 737 F.2d 439, 444 (5th Cir.1984) (in *Garber*, "[a]wareness of legal debate ... was virtually presumed; however, we did not hold that in the absence of such a level of uncertainty—approaching legal vagueness—that we could not require a defendant to link his own belief to the evidence of legal uncertainty").

The rule against sham transactions for tax avoidance is quite well-settled, however, and appellees do not assert that it is vague; rather, appellees claim uncertainty of whether their transaction falls factually within its prohibition. Appellees' subjective intent to engage in prohibited conduct (assuming the transaction was a sham) is thus relevant to the prosecution. The government must prove that appellees evidenced an intent to engage in a transaction within the prohibition. *United States v. Heller*, 830 F.2d 150, 155 (11th Cir.1987) [14] (uncertainty created by prior Tax Court decision approving certain accounting method; if defendant "followed such a method, or believed in good faith he was following the method, criminal liability cannot be imposed upon him").

One way for appellees to demonstrate lack of intent would be to point to a Tax Court decision, an IRS opinion, or some other authoritative statement that argu-

---

to generate deductions. No party, including the lender, had sufficient funds to cover its checks. The court naturally found this a sham and fraudulent." The government may argue to the jury that appellees did not intend or have a right to expect that Clariden's allegedly substantial funds could be used to cover the checks.

**14.** Appellee Heller is not related to the defendant in *United States v. Heller*, 830 F.2d 150 (11th Cir.1987).

ably condones activities similar to theirs for ends similar to theirs. If appellees produce such a statement, the district court may in its discretion admit it into evidence, and should then instruct the jury as this court recently suggested in *Heller:* if appellees patterned their transaction after the statement, or in good faith intended to pattern their transaction after the statement, they cannot be punished criminally. *Id.,* 830 F.2d at 155.

■ Appellees may not, however, rely merely upon the *absence* of an official statement *prohibiting* behavior identical to theirs,[15] coupled with opinions of partisan experts who opine after the deal is done, to establish legal uncertainty. These factors will be present in any prosecution for concocting bogus tax shelters. If on the basis of a more substantial proffer the district court admits evidence of legal uncertainty, however, expert testimony may be probative of the sincerity and reasonableness of appellees' beliefs.

### IV.

The district court's order dismissing portions of the indictment against Heller and all of the indictment against Adler is VACATED, the indictment is REINSTATED in full, and the prosecution should proceed.

---

**15.** *United States v. Brown,* 555 F.2d 336, 339–40 (2d Cir.1977) (criminal statute not inapplicable to defendant merely because "there is no litigated fact pattern precisely in point"). We recognize that *United States v. Dahlstrom,* 713 F.2d 1423 (9th Cir.1983), *cert. denied,* 466 U.S. 980, 104 S.Ct. 2363, 80 L.Ed.2d 835 (1984), may be to the contrary. *Dahlstrom* held that the government failed to establish criminal intent because it could not cite a case disapproving of a tax shelter similar to the defendants' which preceded the defendants' activities; also, a government witness testified that foreign trusts used in the tax shelter were "valid legal entities." 713 F.2d at 1427. We disagree that these two factors, without more, constitute a defense to a fraudulent tax-shelter prosecution. Clever swindlers could rarely be prosecuted if a particular sham must be ruled illegal before its use can be criminal; and, as with the instant case, the regularity of a transaction under local law is often irrelevant to the question of federal tax consequences.

We note that the Ninth Circuit recently distinguished *Dahlstrom* and considerably diminished its reach: in *Dahlstrom,* the defendants not only advocated a tax shelter, but "occasionally assisted [a taxpayer] in establishing his [tax shelter] by travelling to the designated country and executing the requisite trust documents on behalf of [the taxpayer]." 713 F.2d at 1425. The court in *United States v. Schulman,* 817 F.2d 1355, 1359 (9th Cir.), *cert. dismissed,* — U.S. —, 108 S.Ct. 362, 97 L.Ed.2d 803 (1987), read *Dahlstrom* as follows: "*Dahlstrom* is more properly read as a case barring the '[p]rosecution for *advocacy* of a tax shelter program in the absence of any evidence of a specific intent to violate the law ...' [citing cases]. In this case, Schulman did not merely advocate the tax shelter in question, he was involved in 'orchestrating the generation of the questionable tax deduction.' [citing cases]." (Emphasis in original.)