T.C. Memo. 2011-122

UNITED STATES TAX COURT

WILFREDO EMILIO RODRIGUEZ, A MINOR, STEVEN W. CONNER, GUARDIAN,
Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12864-10.                    Filed June 2, 2011.

        C is guardian of the property of P, a minor who is
mentally and physically handicapped.  C arranged for
P's parents to transfer title of their home to C in his
individual capacity.  C used P's funds to satisfy the
mortgage on the home.  C in his individual capacity
then transferred title of the home to himself as P's
guardian.  C prepared P's tax return and claimed the
$8,000 first-time homebuyer credit.
        <u>Held</u>:  P is not entitled to the first-time
homebuyer credit because he purchased the home from
related persons (his parents).  See I.R.C. sec.
36(c)(5).  Economic substance and step transaction
doctrines applied.

Steven W. Conner (guardian), for petitioner.

<u>Lynn M. Barrett</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION


ARMEN, <u>Special Trial Judge</u>:  Respondent determined a deficiency in petitioner's 2008 Federal income tax of $8,000 and an addition to tax of $29.70 under section 6651(a)(1) for failure to timely file a tax return.[1]  After a concession by respondent,[2] the issue for decision is whether petitioner is entitled to the $8,000 first-time homebuyer credit (FTHBC) under section 36 for 2008.

### FINDINGS OF FACT

Some of the facts have been stipulated, and they are so found.  We incorporate by reference the parties' stipulation of facts and accompanying exhibits.  At the time the petition was filed, Wilfredo Emilio Rodriguez (Emilio) resided in Florida.

Emilio was born in April 2001 to Wilfredo and Soledad Rodriguez (Mr. and Mrs. Rodriguez).  Emilio suffered trauma at birth and as a result is mentally and physically handicapped.

In June 2001 Mr. and Mrs. Rodriguez purchased a home in Middleburg, Florida (the home), and financed it with a mortgage of $108,785.  Emilio and Mr. and Mrs. Rodriguez have resided continuously in the home since June 2001.

---

[1]  Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended.

[2]  Respondent concedes the addition to tax under sec. 6651(a)(1) for failure to timely file a tax return.

In 2004 Emilio received net proceeds of $463,907.10 in settlement for the injuries he sustained at birth.

On November 16, 2004, Steven W. Conner (Mr. Conner) was appointed guardian of the property of Emilio (guardian) by the Circuit Court, Fourth Judicial Circuit, in and for Clay County, Florida, Probate Division (the probate court). Mr. Conner was appointed guardian because Mr. and Mrs. Rodriguez are of "humble means" and are not financially sophisticated. Although no training is required to become a guardian, Mr. Conner is familiar with Florida State guardianship provisions. Mr. Conner is presently guardian of the property of one other individual and was the guardian of the property of approximately three other individuals.

Mr. Conner holds both bachelor's and master's degrees in accounting. Mr. Conner has been a certified public accountant (C.P.A.) for approximately 25 years and is a member of the Florida Institute of C.P.A.s. Mr. Conner owns a C.P.A. practice and has approximately 12 employees. Mr. Conner's areas of concentration include Internal Revenue Service defense and tax planning. Mr. Conner spends 60 percent of his time "representing [and] defending businesses and individuals that the IRS has decided to audit for one reason or another."

Although Mr. Conner professes not to be financially savvy, he believes he is capable of making wise investments. Mr.

Conner's ultimate goal when investing is "to make money."  Mr. Conner presently owns, and has previously owned, various investment properties ranging from small commercial properties to multiacreage residential properties.

On March 29, 2005, the probate court issued an order authorizing a monthly allowance of $200 to Mr. and Mrs. Rodriguez from Emilio's funds.  On July 26, 2006, the probate court issued an order authorizing an increase in the monthly allowance from Emilio's funds to $300 for the payment of medical and other bills for Emilio.  At all relevant times Mr. and Mrs. Rodriguez continued to receive the allowance of $300 from Emilio's funds.

In early 2009 Mr. Conner learned that Mr. and Mrs. Rodriguez were experiencing financial difficulty and had missed several mortgage payments.  At some point before February 17, 2009, Mr. Conner petitioned the probate court for an order authorizing a loan of $103,000 from Emilio's funds to Mr. and Mrs. Rodriguez to satisfy the mortgage.  On February 17, 2009, the probate court issued an order authorizing the loan.[3]

At trial Mr. Conner testified that on three separate occasions after February 17, 2009, he contacted the holder of the mortgage on the home and informed the company that Emilio intended to lend Mr. and Mrs. Rodriguez the funds necessary to

---

[3]  The order authorizing the loan indicates that the loan would be for a term of 30 years at a rate of 6 percent interest, with a promissory note to balloon in 20 years.

satisfy the mortgage, thereby extinguishing the holder's interest in the mortgage. Mr. Conner testified further that the mortgage holder was "not willing to accept * * * payment" from Emilio.

Emilio and his parents never entered into the loan arrangement as contemplated by the February 17, 2009 order of the probate court.

Also on February 17, 2009, section 36 was amended to allow to first-time homebuyers a refundable $8,000 tax credit that generally is not subject to recapture. At some point thereafter, but before the following events, Mr. Conner researched section 36 as amended.

Sometime on or before May 4, 2009, Mr. Conner contacted the mortgage holder to ascertain the current balance of the mortgage on the home. On May 4, 2009, the mortgage holder issued a statement to Mr. Conner indicating that the "total payoff" was $106,621.46. The statement also states that "In an effort to expedite and more efficiently process your payoff request * * * Write the loan number and borrower's name or property address on the check". The statement does not identify or otherwise specify from whom the check must originate.

On May 6, 2009, Mr. Conner transferred $106,621.46 from Emilio's bank account to the escrow account of Mr. Conner's C.P.A. firm.

On May 11, 2009, Mr. and Mrs. Rodriguez executed a warranty deed transferring the home to Mr. Conner in his individual capacity.  The warranty deed was prepared by Mr. Conner.  Although Mr. and Mrs. Rodriguez signed over the title of the home to Mr. Conner, they did not receive anything of monetary value from Mr. Conner in exchange.

On May 14, 2009, a cashier's check was purchased by Mr. Conner's C.P.A. firm for $106,621.46 and sent to the mortgage holder in satisfaction of Mr. and Mrs. Rodriguez's mortgage on the home.

Mr. Conner testified at trial that he purchased the home as an investment.  However, before taking title to the home Mr. Conner did not have the home inspected, nor did he obtain an independent appraisal of the fair market value of the home.  Mr. Conner stated at trial that he did not know the fair market value of the home at the time of the transfer.[4]

Mr. and Mrs. Rodriguez never paid rent to Mr. Conner.  Mr. Conner testified at trial that he was not concerned about the risk involved in the transaction because even "If I didn't collect rent for a year, it wasn't going to make a whole lot of difference in my economic gain as a property holder".

---

[4] We note that the record includes a property record card from the Clay County Property Appraiser indicating that the "just value" of the home on Feb. 19, 2009, was $154,534.  But the Property Record Card is dated Oct. 12, 2009, well after the events described herein.

On May 18, 2009, just 7 days after Mr. and Mrs. Rodriguez transferred title of the home to Mr. Conner, Mr. Conner executed a warranty deed in his individual capacity transferring the home to himself as guardian. The warranty deed was prepared by Mr. Conner. That same day Mr. Conner in his individual capacity as seller and Mr. Conner as guardian and buyer executed a purchase and sale agreement listing a purchase price for the home of $106,621.46.

On May 18, 2009, the mortgage holder executed a release of mortgage because the mortgage had been fully paid.

Both the May 11, 2009 warranty deed and the May 18, 2009 warranty deed were recorded simultaneously on July 14, 2009.

On May 28, 2009, following the transfers of the home on May 11 and 18, Mr. Conner prepared and signed Emilio's 2008 Federal income tax return. On that return, Mr. Conner claimed an $8,000 FTHBC under section 36 relating to Emilio's purchase of the home.[5]

---

[5] The genesis of the events described above that culminated in the claiming of the sec. 36 credit on Emilio's return is revealed in a letter dated Mar. 23, 2009, sent by Mr. Conner to Mrs. Rodriguez, which letter reads in part as follows:

This letter is written to summarize our conversation regarding the purchase of your home by me.

I will purchase the home for the payoff amount from * * * [the mortgage holder]. The payoff amount is approximately $106,000. You said that you were satisfied to make this transaction because you and Mr. Rodriguez have been unable to make the mortgage payments. You will receive no funds from the purchase.

(continued...)

In the notice of deficiency respondent determined, inter alia, that Emilio was not eligible for the FTHBC.

OPINION

Generally, section 36(a) and (b) allows a credit of up to $8,000 to a first-time homebuyer of a principal residence in the United States.[6]  Pursuant to section 36(g) the FTHBC for the purchase of a principal residence in 2009 may be claimed on either the taxpayer's 2008 or 2009 Federal income tax return.

However, under section 36(c)(3) the FTHBC is not available to a taxpayer who purchases a home from a related person.  Under section 36(c)(5) related persons include direct ancestors such as parents.  Sec. 267(b)(1), (c)(4).

_____

[5](...continued)
   After this purchase, I will own the house that you
   presently live in.

   Because of the difficulty of negotiating the close with
   * * * [the mortgage holder], it may take some time to
   actually close the loan.  Your evidence of the sale
   will be the release of lien/mortgage from * * * [the
   mortgage holder] and signing of the warranty deed
   transferring title to me.

   After the sale to me is complete, we will discuss
   whether it makes sense for you to rent the house from
   me or me to sell the house to Emilio.

[6]   The requirement under sec. 36(b)(4) that the taxpayer attain 18 years of age before the date of the purchase to qualify for the FTHBC is effective for purchases after Nov. 6, 2009. Worker, Homeownership, and Business Assistance Act of 2009, Pub. L. 111-92, sec. 12(a)(1), 123 Stat. 2991.

Mr. Conner contends that he as guardian purchased the home from himself in his individual capacity, such that Emilio is eligible for the FTHBC.

Respondent contends that the purchase of the home by Mr. Conner in his individual capacity from Mr. and Mrs. Rodriguez lacks economic substance and that as a result of the application of the step transaction doctrine, Emilio effectively purchased the home from his parents, Mr. and Mrs. Rodriguez. Therefore, in respondent's view, Emilio is not eligible for the FTHBC because he purchased the home from related persons as defined in section 36(c)(5). We agree with respondent.

"Federal tax law is concerned with the economic substance of the transaction under scrutiny and not the form by which it is masked." United States v. Heller, 866 F.2d 1336, 1341 (11th Cir. 1989); see also Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945) ("The incidence of taxation depends upon the substance of a transaction. * * * To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress."); Gregory v. Helvering, 293 U.S. 465, 470 (1935) (finding the economic substance of a transaction to be controlling, and stating: "To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious

purpose."). See generally <u>Kirchman v. Commissioner</u>, 862 F.2d 1486, 1490-1494 (11th Cir. 1989), affg. <u>Glass v. Commissioner</u>, 87 T.C. 1087 (1986). "When the form of the transaction has not, in fact, altered any cognizable economic relationships, we will look through that form and apply the tax law according to the substance of the transaction." <u>Zmuda v. Commissioner</u>, 79 T.C. 714, 720 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). The legitimacy of a transaction under State law has no bearing on the economic substance analysis. <u>Id.</u> Conversely, if the substance of a transaction accords with its form, then the form will be upheld and given effect for Federal tax purposes. See <u>Blueberry Land Co. v. Commissioner</u>, 361 F.2d 93, 100-101 (5th Cir. 1966), affg. 42 T.C. 1137 (1964).

In <u>Commissioner v. Court Holding Co.</u>, <u>supra</u> at 334, the Supreme Court explained the step transaction doctrine, stating

> The tax consequences which arise from * * * a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. * * *

The economic substance and step transaction doctrines require "a searching analysis of the facts to see whether the true substance of the transaction is different from its form or whether the form reflects what actually happened." <u>Harris v.</u>

Commissioner, 61 T.C. 770, 783 (1974).  The issue of whether any of those doctrines should be applied involves an intensely factual inquiry.  See Gordon v. Commissioner, 85 T.C. 309, 327 (1985); see also Bowen v. Commissioner, 78 T.C. 55, 79 (1982), affd. 706 F.2d 1087 (11th Cir. 1983).

Mr. Conner contends that Emilio did not purchase the home directly from his parents because the mortgage holder would not accept payment directly from Emilio.  However, it is well established that the Court is "not required to accept the self-serving testimony of petitioner * * * as gospel."  Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).  In Diaz v. Commissioner, 58 T.C. 560, 564 (1972), we observed that the process of distilling truth from the testimony of witnesses, whose demeanor we observe and whose credibility we evaluate, is the daily grist of judicial life.

Mr. Conner did not introduce any documents regarding the alleged refusal of the mortgage holder to accept payment from Emilio, nor did Mr. Conner call as a witness a representative of the mortgage holder to corroborate his testimony.  In this regard it is also well established that a party's failure to call a critical witness may give rise to a presumption that, if called, such witness' testimony would not have been favorable to the party.  Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

Mr. Conner researched section 36 before the purchase and sale of the home and concluded that he was not a related person vis-a-vis Emilio under section 36(c)(5). Mr. Conner must also have concluded that a purchase by Emilio directly from Mr. and Mrs. Rodriguez would make Emilio ineligible for the FTHBC because Mr. and Mrs. Rodriguez were related persons under section 36(c)(5).

For Federal income tax purposes the term "sale" is given its ordinary meaning and "is generally defined as a transfer of property for money or a promise to pay money." Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981) (citing Commissioner v. Brown, 380 U.S. 563, 570-571 (1965)). Mr. and Mrs. Rodriguez, however, did not receive any money from Mr. Conner for the purported sale of their home. Mr. Conner would have us believe that Mr. and Mrs. Rodriguez transferred title for no money and without knowing whether they were going to be renting the home from Mr. Conner or whether title would be transferred to Emilio. But, in fact, Mr. Conner transferred the exact payoff amount from Emilio's bank account into the C.P.A. firm's escrow account before both the transfer of title from Mr. and Mrs. Rodriguez to Mr. Conner and the purchase of the cashier's check by Mr. Conner. As previously stated: "A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title." Commissioner v. Court Holding Co., 324 U.S. at 334.

Mr. Conner orchestrated the purchase and sale of the home to make it appear as if Emilio purchased the home from Mr. Conner in his individual capacity. However, the record demonstrates that Mr. Conner was a mere "conduit through which to pass title" from Mr. and Mrs. Rodriguez to Emilio. Thus, we disregard the intermediate transfer of title from Mr. and Mrs. Rodriguez to Mr. Conner in his individual capacity and instead compress the transaction into a single event, which was a purchase by Emilio from Mr. and Mrs. Rodriguez, his parents. In other words, Mr. Conner structured the form of the transaction in an attempt to qualify Emilio for the FTHBC, but the true substance of the transaction was a purchase from related persons as described in section 36(c)(5).

Because Emilio purchased the home from related persons, he is not entitled to the FTHBC under section 36.

## Conclusion

Finally, in reaching the conclusion described herein, we have considered all arguments made by Emilio, and, to the extent not

mentioned above, we find them to be moot, irrelevant, or without merit.

To give effect to the foregoing,

<u>Decision will be entered for respondent as to the deficiency and for petitioner as to the addition to tax</u>.