**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 27, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ANSCHUTZ COMPANY,

      Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE,

      Respondent-Appellee.

- - - - - - - - - - - -

LIBERTY MEDIA CORPORATION,

      Amicus Curiae.

No. 11-9001

---

PHILIP F. ANSCHUTZ; NANCY P.
ANSCHUTZ,

      Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE,

      Respondent-Appellee.

- - - - - - - - - - - -

LIBERTY MEDIA CORPORATION,

      Amicus Curiae.

No. 11-9002

## APPEAL FROM THE UNITED STATES TAX COURT
(T.C. Nos. 18942-07 & 19083-07)

Kenneth W. Gideon (B. John Williams, Jr; David W. Foster; Melissa R. Middleton, with him on the briefs), of Skadden, Arps, Slate, Meagher & Flom LLP, Washington, D.C., for Petitioners-Appellants.

Judith A. Hagley, Attorney, Tax Division, Department of Justice (Gilbert S. Rothenberg, Acting Deputy Assistant Attorney General; Richard Farber, Attorney, Tax Division, Department of Justice, with her on the brief), Washington, D.C., for Respondent-Appellee.

Andrew M. Low, Laurence E. Nemirow, and Kyle W. Brenton of Davis Graham & Stubbs LLP, Denver, Colorado, filed an amicus brief for Liberty Media Corporation.

Before **BRISCOE,** Chief Judge, **McKAY** and **O'BRIEN**, Circuit Judges.

**BRISCOE**, Chief Judge.

Petitioners Anschutz Company and Philip and Nancy Anschutz appeal from a decision of the United States Tax Court holding them responsible for substantial income tax deficiencies for the taxable years 2000 and 2001. Those deficiencies, the Tax Court concluded, resulted from petitioners' failure to recognize taxable gain when a subsidiary of the Anschutz Company entered into a series of related agreements that included a variable prepaid forward contract for the sale of certain shares of stock and accompanying share-lending agreements. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the judgment of the Tax

Court.

I

*The petitioners*

Philip F. Anschutz (Mr. Anschutz) and his wife, Nancy P. Anschutz (Mrs. Anschutz), both Colorado residents, are calendar year taxpayers who file joint federal income tax returns. Mr. Anschutz is the sole shareholder of Anschutz Company, an S corporation with its principal place of business in Denver, Colorado. Anschutz Company was, at all times relevant to this action, the sole stockholder of The Anschutz Corporation (TAC). TAC is a Kansas corporation with its principal place of business in Denver, Colorado. Anschutz Company elected, at all times relevant to this action, to treat TAC as a qualified subchapter S subsidiary under Internal Revenue Code § 1361(b)(3)(B)(ii). As a result of this election, all assets, liabilities, income, deductions, and credits of TAC were treated as those of Anschutz Company on the Anschutz Company's federal income tax returns for the years in question.

*Mr. Anschutz's business and investment activities*

In the 1960's, Mr. Anschutz began investing in and operating companies engaged in the exploration of oil and the development of natural resources. Mr. Anschutz subsequently expanded his investment and business activities to include railroads, real estate, and entertainment companies. Because Mr. Anschutz's investments left him holding large blocks of various companies' stock, Mr.

3

Anschutz used TAC as an investment vehicle to hold that stock.

In the late 1990's and early 2000's, Mr. Anschutz and executives at the Anschutz Company began investigating potential sources of cash to fund Mr. Anschutz's business and investment activities. They ultimately decided to leverage TAC's stock holdings by entering into a series of variable prepaid forward contracts (VPFCs) and share-lending agreements (Share-Lending Agreements), with Donaldson, Lufkin & Jenrette Securities Corp. (DLJ).[1] Consequently, TAC and DLJ negotiated, over the course of a year, the structure, basic provisions, and terms of all the memorializing documents for the transactions. The stock transactions were memorialized on May 9, 2000, by TAC's and DLJ's signing of a master stock purchase agreement (MSPA) and various accompanying documents. The MSPA provided the basic framework for, and defined certain terms and requirements that applied to, the underlying stock transactions.

*The VPFCs*

Generally speaking, a forward contract is an agreement that anticipates the actual delivery of a commodity on a specified future date. See Dunn v. Commodity Futures Trading Comm'n, 519 U.S. 465, 472 (1997). A VPFC, a

---

[1] DLJ was a subsidiary of Donaldson, Lufkin & Jenrette, a United States investment bank. On November 3, 2000, DLJ was acquired by Credit Suisse First Boston, Inc. This acquisition did not materially affect the terms of the stock transactions.

species of forward contract, typically "involves a counterparty, frequently a financial institution[,] and a shareholder who owns stock that has appreciated significantly" but "do[es] not want to sell [that] stock because the sale will trigger a tax liability." ROA, Ex. 147 at 8. "Upon entering a VPFC, the shareholder 'pledges' shares of appreciated stock to [the counterparty], wh[ich] is granted a security interest in the pledged shares." Id. The counterparty then executes a short sale[2] of the same stock and provides the shareholder with a percentage of the proceeds of that short sale. The stock pledged by the shareholder "provides collateral to the [counterparty] for the upfront payment and guarantees the shareholder's financial obligations under the VPFC." Id. At the maturity date of the VPFC, typically "a number of years later, the shareholder delivers to the [counterparty] the specified number of pledged shares of stock based upon the price of the stock at the time and according to a formula" agreed upon by the shareholder and counterparty at the inception of the VPFC. Id. Alternatively, the VPFC may allow the shareholder to settle the contract with an equivalent amount of cash or with equivalent, but not identical, shares of stock.

Each of the VPFCs in this case required DLJ to make an upfront payment to TAC in exchange for a promise by TAC to deliver a variable number of shares to

_____

[2] A short sale occurs when a "seller sells a security he does not own, borrows the security from a broker [or third party] to meet the delivery obligation, and then purchases an identical security to return to the broker [or third party]." Whistler Inv., Inc. v. Depository Trust and Clearing Corp., 539 F.3d 1159, 1162 (9th Cir. 2008).

5

DLJ approximately ten years in the future. TAC and DLJ agreed that DLJ would, for each VPFC, make an upfront payment equal to 75 percent of the fair market value of the shares subject to that VPFC. TAC and DLJ also agreed that there would be a ceiling on TAC's entitlement to any appreciation in the stock over the term of the VPFC. Specifically, the parties agreed that if the fair market value of the stock subject to a specific VPFC increased over the term of the contract, TAC would be entitled to retain the first 50 percent of this appreciation, while any additional appreciation above the first 50 percent would belong to DLJ.

*The MSPA*

The MSPA required TAC to pledge the shares of stock that were the subject of the VPFCs as collateral for the upfront cash payments and to guarantee TAC's performance under the VPFCs. The shares pledged by TAC were delivered to Wilmington Trust Co. (WTC), the collateral agent and trustee.

Relatedly, the MSPA required the execution of a transaction schedule for each stock at issue, as well as, for each such transaction schedule, a pledge agreement establishing collateral accounts with WTC. TAC and DLJ executed three transaction schedules and pledge agreements corresponding to those transaction schedules. Each pledge agreement required WTC, as collateral agent, and DLJ to execute a Share-Lending Agreement that would allow WTC to lend shares of stock to DLJ. Three Share-Lending Agreements were executed corresponding to the three pledge agreements.

6

In addition, the MSPA required that each VPFC and each instance of share lending be memorialized by a pricing schedule and notice of borrowing. Each pricing schedule and notice of borrowing established a "tranche," i.e., a number of related securities that are part of a larger securities transaction.[3] There were a total of 10 pricing schedules and notices of borrowing executed pursuant to the three transaction schedules and three Share-Lending Agreements: the first transaction schedule encompassed six tranches; the second transaction schedule encompassed three tranches; and the third transaction schedule encompassed only one tranche.[4]

Lastly, the MSPA afforded DLJ the right to accelerate the settlement date of a VPFC if certain events occurred (including if TAC filed for bankruptcy, if a material change in TAC's economic position occurred, or if DLJ was unable to hedge its position with respect to the stock at issue in the VPFC). If DLJ accelerated a transaction, TAC would have to deliver a number of shares that would vary with the parties' relative economic positions at the time of acceleration.

---

[3] "'Tranche' is the French word for 'slice.' In the field of investments, tranche refers to a security that its sellers split into smaller pieces to be sold to investors." In re Regions Morgan Keegan Sec., Derivative, and ERISA Litig., 743 F. Supp. 2d 744, 752 n.2 (W. D. Tenn. 2010).

[4] The specific tranches were identified by a combination of two letters and two numbers, with the first letter and number representing the transaction at issue, and the second letter and number representing the tranche at issue. For example, "T2T1" represented Transaction #2, Tranche #1.

*The Share-Lending Agreements*

Share-lending agreements, which "are over-the-counter . . . trades in the financial markets," ROA, Ex. 147 at 47, are often entered into by equity holders who have taken a long position with respect to a stock and plan on holding it for an extended period. The equity holder agrees to lend the stock to another party, the borrower, who can use the borrowed shares to increase market liquidity and facilitate stock sales. The borrower typically pledges cash collateral, and the lender derives a profit lending the shares by retaining a portion of the interest earned from this cash collateral. At the end of the lending period, the borrower returns the borrowed shares to the equity owner/lender. "If the borrower fails to return the [shares] then the lender will go to the market to buy the shares of stock with the [cash] collateral." Id.

Three Share-Lending Agreements were executed by WTC and DLJ, corresponding to the three transaction schedules and pledge agreements entered into under the MSPA. WTC, pursuant to the pledge agreements, held title to the pledged stock and acted as TAC's agent in entering into the Share-Lending Agreements. For each Share-Lending Agreement, TAC received a prepaid lending fee calculated by reference to the value of the lent shares. That lending fee was typically equal to 5 percent of the fair market value of the shares lent under the Share-Lending Agreements.

The Share-Lending Agreements were divided into separate tranches, and

each tranche was established by the filing of a notice of borrowing with WTC. The tranche establishment notice assigned a tranche number and identified the number of shares subject to the Share-Lending Agreement tranche. Each notice of borrowing corresponded to a specific tranche established under one of the three transaction schedules.

The Share-Lending Agreements also provided procedures for the transfer of shares, periodic payments of dividends and distributions with respect to the shares at issue, payment of fees, guaranties, and for the recall of shares lent under the agreement. The Share-Lending Agreements provided that TAC could recall the pledged shares by notifying WTC, which in turn would inform DLJ of the recall. Upon receiving this information, DLJ would return to TAC's collateral accounts at WTC the number of borrowed shares subject to that specific recall. If TAC recalled shares from DLJ, TAC would have to return a pro rata portion of the prepaid lending fee it received upon the initial share lending.

*The transaction schedules*

Each transaction schedule identified the issuer, the type of security at issue, and the maximum number of shares that would be subject to the transaction. Each transaction schedule also defined certain terms, including the effective date and maturity dates of the transaction, the "Minimum Average Hedge Price," the "Hedging Termination Date," the "Threshold Appreciation Price Multiplier," the "Purchase Price Multiplier," and the "Maximum Borrow Cost Spread Trigger."

9

Each transaction schedule was effective as of the date of its execution. The transaction schedules had a range of maturity dates beginning on the 10th anniversary, and ending on the 11th anniversary, of the effective date of the transaction.

For each transaction, DLJ executed a short sale of the same stock in the open market. The short sales were executed between the effective date of a transaction schedule and the hedging termination date. The hedging termination date was the final date for DLJ to execute short sales to determine the "average hedge price."

### The pricing schedules

Each individual stock transfer made pursuant to one of the transaction schedules was memorialized by a pricing schedule. The execution of a pricing schedule established a tranche for that transaction, and the sum of the base shares in each tranche equaled the number of shares subject to the transaction schedule.

The information in each pricing schedule was generated by DLJ's short sales of stock. These short sales effectively hedged DLJ's risk on the forward contract by protecting DLJ from a decrease in stock value during the term of the VPFC.

The average hedge price, as defined in the pricing schedules, was the average price DLJ received on its short sales. The downside protection threshold price, under the terms of the pricing schedules, was equal to the average hedge

10

price and represented the lowest value that TAC could receive for its shares on the settlement date. This, in effect, locked in a value per share that TAC would receive credit for when the VPFCs were settled, and eliminated any risk of loss that TAC would otherwise suffer if the market value of the pledged shares declined below the downside protection price.

The initial threshold appreciation price multiplier, which was defined in the pricing schedules as 1.50, was applied to the average hedge price to calculate the threshold appreciation price. The threshold appreciation price was the maximum amount per share that TAC would retain.

In sum, TAC was entitled to retain any stock value above the downside protection threshold price and below or equal to the threshold appreciation price. Any value per share above the threshold appreciation price accrued to DLJ.

*Execution of the VPFCs and Share-Lending Agreements*

Each of the VPFCs was executed in the following manner. TAC first alerted DLJ that it wanted to execute a VPFC. DLJ, in turn, borrowed shares of the stock at issue in the pricing schedule from an unrelated third party and sold those shares in the open market as part of a series of short sales. The short sales, which were executed between the execution date of the pricing schedule and the hedging termination date, were used to determine TAC's upfront payment. The results of the short sales were compiled in the pricing schedule. The short sale proceeds were used to fund the upfront payment made by DLJ under the VPFC,

11

and left DLJ with an obligation to close out the short sale by transferring identical shares to the original third-party lender. DLJ, by way of the Share-Lending Agreements, "used TAC's pledged shares to close out [its] . . . short sale[s]." ROA, Ex. 147 at 44. The VPFCs and short sales thus combined to reduce or eliminate DLJ's risk of loss on the stock purchases: if the fair market value of stock subject to the VPFCs dropped over the course of the contract, the short sales would earn a profit; if the fair market value increased, the VPFCs would earn a profit.

DLJ always engaged in a series of short sales rather than executing a single short sale encompassing the entire amount of stock at issue in a pricing schedule. More specifically, DLJ would split the number of shares over a number of different short sales as part of the process of establishing each tranche. The various prices received on these short sales were then averaged to determine the average hedge price for the tranche.

The results of these short sales also impacted other key terms in the various pricing schedules. As noted, the average hedge price equaled the downside threshold protection price. The base number of shares was multiplied by the average hedge price and the purchase price multiplier to determine the amount of TAC's upfront payment. The downside protection threshold price was multiplied by the initial threshold appreciation price multiplier to determine the maximum amount of value per share that TAC would be entitled to keep if the stock

12

appreciated.

The cash proceeds from the short sales were used by DLJ to fund the upfront payment of the VPFCs. Payment was made within five days of delivery of the pricing schedule to TAC. DLJ, in turn, under the terms of the share-lending agreements, obtained from WTC the shares of stock pledged by TAC and delivered those shares to the third parties from whom it had previously borrowed shares to accomplish its pre-transaction short sales. ROA, Ex. 147 at 17, 44.

*The three transactions*

*Transaction 1*

On May 9, 2000, TAC and DLJ executed a transaction schedule pursuant to the MSPA. This transaction, the parties' first (hereafter Transaction 1), involved shares of Union Pacific Resources Group, Inc. (UPR) common stock and Anadarko Petroleum Corp. (APC) common stock.

The transaction schedule for Transaction 1 set forth an effective date of May 9, 2000, and a range of maturity dates falling between ten and eleven years after the effective date. The transaction schedule established a hedging termination date of December 31, 2000, an initial threshold appreciation price multiplier of 1.50, and a purchase price multiplier of .75. Although the MSPA authorized TAC to settle with either cash or securities, the transaction schedule deleted the cash settlement option.

On May 9, 2000, TAC, DLJ, and WTC entered into a pledge agreement

13

with respect to the stock at issue in Transaction 1.

Transaction 1 was divided into six tranches, corresponding to six pricing schedules. Three of the six pricing schedules involved a total of 4 million shares of UPR common stock. The other three involved a total of 2,217,903 shares of APC common stock.

The pricing schedule for the first tranche (T1T1) was dated May 12, 2000, and was for 1.5 million shares of UPR common stock. This tranche had an average hedge price of $21.49. TAC received an upfront cash payment of $24,181,087 for the tranche. DLJ executed a share-lending notice, which established a corresponding borrowing tranche of 1.5 million shares of stock. DLJ actually borrowed 1,449,000 shares. TAC received a prepaid lending fee of $1,640,143 for these shares.

The pricing schedule for the second tranche (T1T2) was identical to the pricing schedule for the first tranche. In particular, it covered 1.5 million shares of UPR common stock, had an average hedge price of $21.49, and TAC received an upfront cash payment of $24,181,087 for the tranche. As with the first tranche, DLJ executed a share-lending notice establishing a corresponding borrowing tranche of 1.5 million shares of stock, and DLJ borrowed 1,449,000 shares. TAC received a prepaid lending fee of $1,640,143 for these shares.

The pricing schedule for the third tranche (T1T3) was dated June 9, 2000, and was for one million shares of UPR common stock. This third tranche had an

14

average hedge price of $23.76.  TAC received an upfront cash payment of $17,818,725 for the tranche.  DLJ executed a share-lending notice, which established a corresponding borrowing tranche of one million shares of stock.  DLJ actually borrowed all of these one million shares.  TAC received a prepaid lending fee of $1,131,914 for these shares.

On July 14, 2000, UPR merged with APC.  As a result, the four million shares at issue in the first three tranches were converted to 1,820,000 shares of APC common stock.  The 3,898,000 shares actually borrowed by DLJ were converted to 1,773,590 shares of APC common stock.

The pricing schedule for the fourth tranche (T1T4) was dated August 8, 2000, and was for 951,117 shares of APC common stock.  This fourth tranche had an average hedge price of $49.85.  TAC received an upfront cash payment of $35,559,530 for the tranche.  DLJ executed a share-lending notice, which established a corresponding borrowing tranche of 951,117 shares.  DLJ actually borrowed 747,182 shares.  TAC received a prepaid lending fee of $2,370,635 for these shares.

The pricing schedules for the fifth and sixth tranches (T1T5 and T1T6) were identical.  Each was dated August 10, 2000, was for 633,393 shares of APC common stock, and had an average hedge price of $52.49.  For each of these tranches, TAC received an upfront cash payment of $24,937,189.  DLJ executed share-lending notices for each of these tranches, establishing corresponding

15

borrowing tranches.  DLJ actually borrowed 523,984 shares from each tranche, and TAC received prepaid lending fees of $1,662,479 for the shares borrowed from each tranche.

*Transaction 2*

On December 5, 2000, TAC and DLJ executed a transaction schedule for the second transaction (Transaction 2) for two million shares of Union Pacific Corporation (UPC) common stock.  The schedule was later amended to allow for a maximum of three million shares of UPC common stock.  The transaction schedule for Transaction 2 established an effective date of December 5, 2000, a range of maturity dates, a hedging termination date of January 30, 2001, an initial threshold appreciation price multiplier of 1.50, and a purchase price multiplier of .75.  The transaction schedule provided that Transaction 2 could not be settled in cash.

On that same date, December 5, 2000, TAC, DLJ and WTC executed a pledge agreement for the shares subject to Transaction 2.  On February 9, 2001, DLJ and WTC, as the agent for TAC, entered into a Share-Lending Agreement with respect to the shares at issue in Transaction 2.

Transaction 2 was executed via three tranches and three corresponding pricing schedules.  The pricing schedule for the first tranche (T2T1) was dated January 4, 2001, and was for 750,000 shares of UPC common stock.  The first tranche had an average hedge price of $50.56.  TAC received an upfront cash

16

payment of $28,440,562 for the first tranche. DLJ executed a share-lending notice, establishing a corresponding borrowing tranche of 750,000 shares. DLJ actually borrowed 750,000 shares. TAC received a prepaid lending fee of $1,896,037 for these shares.

The pricing schedule for the second tranche (T2T2) was dated January 4, 2001, and was for 750,000 shares of UPC common stock. The second tranche had an average hedge price of $51.09. TAC received an upfront cash payment of $28,742,681 for the second tranche. DLJ executed a share-lending notice, establishing a corresponding borrowing tranche of 750,000 shares. DLJ actually borrowed 750,000 shares. TAC received a prepaid lending fee of $1,916,178 for these shares.

The pricing schedule for the third tranche (T2T3) was dated January 16, 2001, and was for 1.5 million shares of UPC common stock. The third tranche had an average hedge price of $51.61. TAC received an upfront cash payment of $58,061,250 for the third tranche. DLJ executed a share-lending notice, establishing a corresponding borrowing tranche of 1.5 million shares. DLJ actually borrowed 1.5 million shares. TAC received a prepaid lending fee of $3,870,750 for these shares.

*Transaction 3*

On April 5, 2001, TAC and DLJ executed a transaction schedule for the third transaction (Transaction 3) for 2 million shares of UPC common stock. On

17

that same date, TAC, DLJ and WTC entered into a pledge agreement with respect to the shares subject to Transaction 3. DLJ and WTC, as TAC's agent, entered into a Share-Lending Agreement with respect to the shares subject to Transaction 3.

Transaction 3 consisted of only one tranche and one corresponding pricing schedule. The pricing schedule for this single tranche (T3T1) was dated April 25, 2001, and had an average hedge price per share of $56.07. TAC received an upfront cash payment of $84,109,350 for the tranche. DLJ executed a share-lending notice, establishing a corresponding borrowing tranche of 2 million shares. DLJ actually borrowed 2 million shares. TAC received a prepaid lending fee of $5,607,290 for these shares.

*Total payments received by TAC*

TAC received upfront payments under the VPFCs totaling $350,968,652, as well as $23,398,050 in prepaid lending fees under the Share-Lending Agreements.

*The June 13, 2003 amendments*

The MSPA, pledge agreements, and Share-Lending Agreements were amended on June 13, 2003, to (a) reflect the fact that DLJ was acquired by Credit Suisse First Boston, and (b) introduce the concept of "share reduction cash payments." This latter amendment dealt with cash dividends or dividend equivalent payments received by TAC with respect to the stocks subject to the transactions at issue. The share reduction program gave TAC the option of either

18

(a) paying DLJ cash equal to any cash dividends or dividend equivalent payments, or (b) using the payments to acquire additional shares of the particular stock at issue and pledging those additional shares as collateral under the pledge agreements.

*The share recalls*

On two occasions, TAC exercised its right to recall shares lent to DLJ. The first such occasion occurred in 2006, during an IRS audit of petitioners. Petitioners directed TAC to recall a portion of the shares in an attempt to demonstrate to the IRS that the Share-Lending Agreements were valid. The second occasion occurred shortly before trial in this matter. At that time, TAC recalled the remaining shares lent under the Share-Lending Agreements. The shares of stock were recalled to again attempt to demonstrate the legitimacy of the Share-Lending Agreements and TAC's right of recall. In both instances, TAC paid DLJ a pro rata portion of the prepaid lending fee, as required by the Share-Lending Agreements.

*Settling the VPFCs at maturity*

The MSPA established the process for calculating the settlement shares or amount of cash that TAC was required to deliver at the maturity date of each VPFC. Specifically, the number of settlement shares required to be delivered was determined by multiplying the base number of shares in each tranche by the average settlement ratio. The average settlement ratio was calculated before the

19

maturity date and was determined by reference to the adjusted settlement price. The adjusted settlement price was the New York Stock Exchange trading value multiplied by the distribution adjustment factor. The distribution adjustment factor was applied in order to account for any distributions made with respect to the stock at issue at or near the maturity date. Once the adjusted settlement price was calculated, it was compared to the downside protection threshold price and the threshold appreciation price, which provided the range of values in which TAC would keep some appreciation of the stock. If the adjusted settlement price was less than or equal to the downside protection threshold price, the average settlement ratio would be 1. Applying a ratio of 1 to the base number of shares meant that TAC would be required to deliver at most the base number of shares and would not have to return any additional value to DLJ. Thus, if the adjusted settlement price was less than or equal to the downside protection threshold price, then TAC simply had to deliver the number of shares at issue in the tranche. Regardless of how far the value of the stock fell, TAC would not have to return any portion of the upfront cash payment.

If the adjusted settlement price was between the downside protection threshold price and the threshold appreciation price, the average settlement ratio was a ratio that when applied to the base number of shares in each tranche would reduce TAC's ultimate delivery obligation by a certain number of shares. The shares TAC was entitled to keep would be equal in value to any appreciation of

20

the stock that TAC was entitled to retain.

If the adjusted settlement price was greater than the threshold appreciation price, the average settlement ratio was a fraction that when applied to the base number of shares in each tranche would allow TAC to keep the first 50 percent of appreciation and allow any excess appreciation to go to DLJ.

Once the average settlement ratio was determined, it was multiplied by the base number of shares in each tranche. TAC was then required to deliver that number of shares to DLJ to satisfy its obligation under the VPFCs. The shares used to settle the VPFCs could be those in TAC's collateral accounts at WTC (to which the lent shares were returned) or similar shares. Alternatively, cash could be used to make the settlement payment (but only with respect to the transactions covered by Transaction Schedule 3 because the transaction schedules for Transactions 1 and 2 prohibited cash settlement).

*Petitioners' tax treatment of the transactions*

Mr. Anschutz and the Anschutz Company treated the VPFC portions of the MSPA as open transactions and not as closed sales of stock. Thus, they did not report gains or losses from the stock transactions on their federal income tax returns.

TAC had bases during 2000 of $0.87 and $1.91, respectively, in the UPR and APC shares subject to Transaction 1. TAC had a basis during 2001 of $1.51 in the UPC shares subject to Transactions 2 and 3.

21

*The notices of deficiency*

On August 22, 2007, the Commissioner issued a notice of deficiency to the Anschutz Company for tax years 2000 and 2001. The notice of deficiency determined that TAC had entered into closed sales of stock, had received 100 percent of the fair market value for the stock, and thus was liable for section 1374 built-in gains tax in 2000 and 2001 to the extent the value received exceeded Anschutz Company's basis in the stock. The built-in gains tax was calculated by reference to the shares of stock that were pledged to WTC, then borrowed by DLJ. The deficiencies did not include shares pledged as collateral by TAC but not borrowed by DLJ.

On that same date, August 22, 2007, the Commissioner also issued a notice of deficiency to Mr. Anschutz for the same tax years (2000 and 2001). Because S corporations are flow-through entities, the built-in gain the Commissioner determined on the Anschutz Company's returns, less the tax on that gain, flowed to Mr. Anschutz. The notice of deficiency determined deficiencies in Mr. Anschutz's income tax with respect to the adjustments to the Anschutz Company's tax liabilities.

*The Tax Court proceedings*

On August 21, 2007, the Anschutz Company filed its petition in docket No. 18942-07. Two days later, on August 23, 2007, Mr. Anschutz filed his petition in docket No. 19083-07. The two cases were subsequently consolidated.

22

A trial was held before the Tax Court on February 9-10, 2009. On July 22, 2010, the Tax Court issued a written decision concluding that the Anschutz Company and Mr. and Mrs. Anschutz were required to "recognize gain on the MSPA to the extent of cash received in 2000 and 2001." Aplt. Br., A-59. On November 23, 2010, the Tax Court issued decisions ordering that (1) there were "deficiencies in income tax due from [the Anschutz Company] for the taxable years 2000 and 2001 in the amounts of $35,555,065.00 and $41,580,239.00, respectively," id. at A-60; and (2) there were "deficiencies in income tax due from [Mr. and Mrs. Anschutz] for the taxable years 2000 and 2001 in the amounts of $7,151,834.00 and $10,190,555.00, respectively," id. at A-62.

The Anschutz Company and the Anschutzes have now appealed to this court.

II

*Jurisdiction*

The Tax Court had jurisdiction over the petitions for redetermination of deficiency pursuant to 26 U.S.C. §§ 6214(a) and 7442. We have jurisdiction over appeals from decisions of the Tax Court pursuant to 26 U.S.C. § 7482(a)(1).

*Standard of review*

"We review the [T]ax [C]ourt's decision in the same manner as we review a district court decision tried without a jury." Jones v. C.I.R., 560 F.3d 1196, 1198 (10th Cir. 2009). Thus, "we review legal questions de novo and factual questions

23

for clear error." Id. "The general characterization of a transaction for tax purposes is a question of law subject to review." Frank Lyon Co. v. United States, 435 U.S. 561, 581 n.16 (1978).

*Did the transactions at issue result in "sales" of the pledged stock?*

Section 1001(c) of the Internal Revenue Code (IRC) generally requires a taxpayer to recognize "the entire amount of the gain or loss . . . on the sale . . . of property." 26 U.S.C. § 1001(c). In other words, "any sale or other disposition of property is a taxable event." Samueli v. C.I.R., 661 F.3d 399, 402 (9th Cir. 2011) (citing Internal Revenue Code § 1001(c)).

For purposes of the IRC, the term "sale" is given its ordinary meaning and is generally defined as a transfer of property for money or a promise to pay money. Commissioner v. Brown, 380 U.S. 563, 570-71 (1965). Whether a sale has occurred depends upon whether, as a matter of historical fact, there has been a transfer of the benefits and burdens of ownership. Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981). "Some of the factors that have been considered by courts in making this determination are: (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or

24

damages to the property; and (8) which party receives the profits from the operation and sale of the property." Id. (internal citations omitted). With respect to stock transactions in particular, the following factors are also considered relevant to this determination: "(i) whether the purchaser bears the risk of loss and opportunity for gain; (ii) which party receives the right to any current income from the property; (iii) whether legal title has passed; and (iv) whether an equity interest was acquired in the property." H.J. Heinz Co. and Subsidiaries v. United States, 76 Fed. Cl. 570, 581 (Fed. Cl. 2007).

As we discuss in more detail below, our analysis of these factors leads us to conclude that the Tax Court was correct in treating the transactions at issue as sales of TAC's pledged shares of stock.

*a) Legal title to the pledged shares*

The relevant documents in this case required that the shares pledged by TAC as collateral, and in turn transferred to DLJ, contain no restrictions. In particular, the Pledge Agreements expressly required TAC to deliver to WTC "the Maximum Number of Shares of Common Stock, free of all Transfer Restrictions . . . ." ROA, Ex. 38-P at 5. In turn, the Share-Lending Agreements expressly provided that "[a]ll Loaned Shares . . . loaned by [WTC] to [DLJ] w[ould] be Free Shares in the hands of [DLJ]." Id., Exh. 39-P at 5. The Share-Lending Agreements defined the phrase "Free Shares" as "shares of Common Stock that are not subject to any Transfer Restrictions in the hands of Lender [TAC]

25

immediately prior to delivery to Borrower [DLJ] hereunder and would not be subject to any Transfer Restrictions in the hands of Borrower upon delivery to Borrower," id. at 16, and the phrase "Transfer Restrictions" as "any condition to or restriction on the ability of the holder thereof to sell, assign or otherwise transfer such share of Common Stock or to enforce the provisions thereof or of any document related thereto," id. at 19.

Together, these documents effectively afforded DLJ all incidents of ownership in the pledged and borrowed shares, including the right to transfer them. And, indeed, DLJ actually transferred the shares in order to repay the third parties it had borrowed similar shares from to conduct its pre-transaction short sales. Thus, this factor weighs in favor of treating the transactions as sales of the shares at the time of their inception.

*b) How did the parties treat the transaction?*

It is undisputed that petitioners, TAC and DLJ treated the transactions as executory contracts for the sale of TAC's shares to DLJ, rather than current sales of the shares. We do not assign much weight to this fact, however, given the specifics of the underlying agreements. When all of the documents at issue are considered as a whole, it is apparent that the parties knew that DLJ, shortly after the inception of the agreements, would be taking possession of, and in turn transferring to third parties, the majority of the shares of stock pledged by TAC. In addition, the parties knew that the various agreements significantly altered the

26

benefits and burdens to TAC of its purported stock ownership.

*c) Did DLJ acquire an equity interest in the pledged shares?*

In a Coordinated Issue Paper (CIP)[5] issued on February 6, 2008, the IRS

considered the question of whether "certain VPFC transactions that include a

share lending agreement or other similar arrangement permitting the counterparty

to borrow the pledged shares . . . would result in a current sale of such shares . .

. ." 2008 WL 852615. As part of its analysis, the CIP directly addressed the

question of whether the "counterparty" in a VPFC transaction (in this case DLJ)

acquires an equity interest in the pledged stock:

> This test has its primary application in the area of nonrecourse
> financing – whether the purported purchaser of property has an
> interest in the property that he cannot prudently abandon. See Estate
> of Franklin v. Commissioner [sic] 544 F.2d 1045, 1047 (9th Cir
> 1976). Where property is ostensibly purchased with a nonrecourse
> note that greatly exceeds the actual value of the property, the titular
> purchaser does not acquire an equity in that property because
> payments on the principal of the purchase price yield no equity so
> long as the unpaid balance of the purchase price exceeds the then
> existing fair market value. In this transaction, however, the
> counterparty clearly has an equity interest in the pledged shares. The
> counterparty has paid between 75 percent and 85 percent of the
> purchase price up front and is economically entitled to 100 percent of
> the initial value of the stock with no obligation to make additional

---

[5] CIPs are designed "to identify, coordinate and resolve complex and significant . . . issues by providing guidance to field examiners and ensuring uniform application of the law." Internal Revenue Service publication, available at http://www.irs.gov/businesses/article/0,,id=96445,00.html (last visited on November 22, 2011). CIPs are "review[ed] by the Office of Chief [IRS] Counsel" prior to "issu[ance] by the Commissioner . . . ." Id. "Although these papers are not official pronouncements on the issues, they do set forth the Service's current thinking." Id.

payments. In contrast, the taxpayer has effectively cashed out its equity in the property in exchange for the upfront cash payment and a contingent contract right to acquire a certain number of shares based on the stock price on the settlement date. This factor favors treatment as a current sale.

Id. at § 1a(3).

We find this analysis compelling and applicable to the case before us. Under the terms of the controlling documents, TAC effectively exchanged its ownership rights in the pledged stock for (a) an upfront cash payment equal to 75% of the pledged stock's then-existing market value, (b) a 5% prepaid tranche fee, (c) the potential of benefitting to a limited degree if the pledged stock increased in value over the life of the transactions, and (d) the complete elimination of any risk of loss of value in the pledged stock. DLJ, in turn, obtained the right to use the pledged stock as it saw fit, and indeed used most of the pledged stock to repay the entities from whom it borrowed similar shares of stock to conduct its pre-transaction short sales. Thus, in effect, DLJ acquired an equity interest in the pledged shares.

*d) Present obligation of the parties*

Under the terms of the VPFCs, TAC had an immediate obligation to transfer the pledged shares to the possession of WTC. DLJ, in turn, had an obligation to pay TAC an amount equal to 75% of the then-existing market value of the pledged shares. Under the terms of the related Share-Lending Agreements, WTC had an obligation to give the pledged shares to DLJ, and DLJ in turn had an

28

obligation to pay to TAC the requisite prepaid lending fee. Considered together, these obligations bear substantial similarity to a sale of the pledged stock.

*e) Right of possession of pledged shares*

Under the terms of the VPFCs, TAC gave possession of the pledged shares to WTC. In turn, under the terms of the Share-Lending Agreements, WTC gave possession of most of the pledged shares to DLJ. Although the share-lending agreements gave TAC the right to recall the shares lent to DLJ, it is uncontroverted that, for nearly the entire life of the transactions (with the exception of the two recalls of shares), DLJ retained possession of the pledged shares. This, in our view, weighs in favor of treating the transactions as sales of the shares at issue.

*f) Risk of loss*

The record on appeal indicates that, "[u]pon execution of the Transactions, TAC transferred 100% of the price risk associated with the pledged shares." ROA, Ex. 147 at 27. More specifically:

> TAC was fully protected from a fall in the stock price below the Downside Price for the Base Amount of Shares documented in each Pricing Schedule for each Tranche. In each Tranche, the Downside Price [wa]s the price that DLJ[] was able to sell shares of stock at execution (creating the Hedge Price for the Tranche) to establish the Tranche Trade Date Value. Upon entering the Transactions, TAC was provided full price risk protection from a fall in the market price of the pledged shares, fundamentally changing the financial risk characteristics of the pledged equity.

Id.

"Although the payoff profile to TAC of the . . . pledged shares . . . was not entirely fixed, it was relatively fixed within a relatively narrow range," and TAC consequently "had significantly less price risk . . . than it would have [had] by simply holding onto the shares and selling them after ten years." Id. at 31. Specifically, there was a "53%-57% [statistical] probability that the Maturity Price [of the pledged shares] would be below the Downside Price," and "TAC transferred 100% of the price risk of the pledged shares upon entering [into] the Transaction, since TAC was no longer exposed to the fall in stock price of the pledged shares." Id. at 35. Thus, "[b]y entering into" the transactions at issue, "TAC fundamentally altered the price risk . . . characteristics of the . . . pledged shares." Id. at 31. And, "by eliminating 100% of the price risk, a defining stock characteristic was removed." Id.

g) *Opportunity for gain*

The parties agreed that if the fair market value of the stock subject to a specific VPFC increased over the term of the contract, TAC would be entitled to retain the first 50 percent of this appreciation, while any additional appreciation above the first 50 percent would belong to DLJ. In other words, "the price reward to TAC w[as] . . . capped once the stock price equaled the Appreciation Price, regardless of how high the price of the pledged shares rose." Id. at 29. Consequently, "TAC had significantly less . . . price reward from the . . . shares [at issue] by executing [the transactions] than it would have [had] by simply

30

holding onto the shares and selling them after ten years." Id. at 31. For example, with respect to the three tranches included in Transaction #1, TAC transferred to DLJ 71%, 63%, and 63%, respectively, of the price reward for each tranche. Id. at 35.

*h) Voting rights*

Under the terms of the Share-Lending Agreements, "the voting rights of the [pledged] shares [we]re transferred along with the stock." Id. at 39. Specifically, the Share-Lending Agreements provided:

> Borrower [DLJ] shall have all incidents of ownership of the Loaned Shares, including the right to transfer them. Lender [TAC] and Agent further waive the right to vote, to consent, or to take any similar action in respect of the Loaned Shares when the record date or deadline for such vote, consent or other action falls within the term of the Loan.

Id. (quoting Section 7 of Share-Lending Agreement dated 6/19/00). Thus, for the entire period that DLJ borrowed a particular share of stock, TAC "no longer retained the voting rights of" that share. Id.

To be sure, "TAC did have the right to recall the [borrowed] shares from DLJ[] and regain the voting rights of th[ose] shares . . . ." Id. However, "[r]ecalling the shares would require TAC to repay a pro rata portion of the entire Prepaid Tranche Fee to DLJ[], which under most scenarios would not be economically rational because of the cost." Id. at 39-40. And TAC actually recalled shares on only two occasions: first in 2006, during an IRS audit, and

31

again shortly before the trial in the Tax Court. As the Tax Court noted, both of those recalls appear to have been intended solely by TAC to persuade the IRS, and in turn the Tax Court, that the Share-Lending Agreements were legitimate.

Thus, in sum, TAC effectively gave up its voting rights in nearly all of the loaned shares shortly after it pledged those shares and DLJ in turn borrowed the shares from WTC.

*i) Dividend rights*

The Share-Lending Agreements, through their use of "complicated formulas," significantly altered TAC's dividend rights with respect to the pledged shares. Id. at 36. Although the Share-Lending Agreements "[u]pon first inspection . . . appear[ed]" to require DLJ to "make a dividend equivalent payment on the transferred pledged shares to TAC," "[u]pon closer examination . . . it appears that TAC was instead entitled to receive dividends on the pledged shares only under certain circumstances." Id.

> [Specifically,] [i]t appears that TAC would receive a dividend payment on the pledged shares – including transferred shares and any shares not transferred – when the stock price of the pledged shares at the maturity of each Tranche was at or above the Downside Price and below the Appreciation Price. At the end of each Tranche, DLJ[] would use a calculation that effectively provided TAC a payment for all of the dividends paid on the pledged shares, including compounding, during the length of the Transactions but only when: (1) the stock price at maturity was at or above the Downside Price; and (2) the dividend payment did not increase the maximum payout specified for the original Tranche. Thus, the dividend payout had a number of financial attributes including:

32

(1) the total dividend payout was capped at the maximum original payout of the Transactions defined by the Call Spread – the stock price difference between the Downside Price and the Appreciation Price multiplied by each Tranche's Base Amount of Shares . . . ;

(2) a dividend payment would not occur if the stock price was below the Downside Price at the maturity of each Tranche; and

(3) the dividend payout had option[-]like characteristics, since a dividend payout would occur only when the ending stock price was at or above the Downside Price.

Id. "Thus, the dividend payout has option features since a payout will only be made when the stock price is at or above the Downside Price and below the Appreciation Price." Id. at 38. Consequently, "TAC [effectively] transferred to DLJ[] [approximately] 83% — 88% of both the risks and rewards of the dividend payments associated with the pledged shares." Id. at 39.

*j) Right to sell or rehypothecate[6] the pledged shares*

As we have already discussed, the related transactions afforded DLJ the right to possess, and ultimately dispose of, the shares pledged by TAC. After purportedly borrowing the pledged shares from WTC, DLJ used those shares to repay the entities it had borrowed similar shares from to conduct its pre-transaction short sales. TAC, in contrast, never had possession of the pledged

---

[6] "Rehypothecation occurs when an intermediary holding securities on behalf of investors—often a broker-dealer acting as prime broker for its customers—grants a security interest in (or otherwise encumbers) those securities in order to obtain financing for itself." Steven L. Schwarcz, Rehypothecation and Intermediary Risk, 2011 Norton Ann. Rev. of Int'l Insolvency 16 (2011).

shares, let alone the right to sell or otherwise use them, during the life of the transactions, except for the two instances in which TAC recalled some pledged shares in an attempt to convince the IRS and the Tax Court that the stock transactions at issue were still open and no closed sales had occurred.

*k) Conclusion*

Considering all of these factors together, we agree with the Tax Court that the transactions should be treated under the IRC as current sales of TAC's shares to DLJ. Not only did DLJ effectively obtain and dispose of the actual shares pledged by TAC, TAC received significant value for those shares and simultaneously lost nearly all of the incidents of ownership of those shares.

*Revenue Ruling 2003-7*

Petitioners contend, as they did in the Tax Court, that their case is "substantially identical to the contract in Rev[enue] Rul[ing] 2003-7," and that, consequently, the transactions at issue should not be treated as current sales of TAC's shares to DLJ. Like the Tax Court, however, we conclude that the underlying facts of this case are distinguishable from those described in Revenue Ruling 2003-7.

Revenue Ruling 2003-7 was based upon the following factual scenario:

An individual ("Shareholder") held shares of common stock in Y corporation, which is publicly traded. Shareholder's basis in the shares of Y corporation is less than $20 per share. On September 15, 2002 (the "Execution Date"), Shareholder entered into an arm's length agreement (the "Agreement") with Investment Bank, at which

34

time a share of common stock in Y corporation had a fair market value of $20. Shareholder received $z of cash upon execution of the Agreement. In return, Shareholder became obligated to deliver to Investment Bank on September 15, 2005 (the "Exchange Date"), a number of shares of common stock of Y corporation to be determined by a formula. Under the formula, if the market price of a share of Y corporation common stock is less than $20 on the Exchange Date, Investment Bank will receive 100 shares of common stock. If the market price of a share is at least $20 and no more than $25 on the Exchange Date, Investment Bank will receive a number of shares having a total market value equal to $2000. If the market price of a share exceeds $25 on the Exchange Date, Investment Bank will receive 80 shares of common stock. In addition, Shareholder has the right to deliver to Investment Bank on the Exchange Date cash equal to the value of the common stock that Shareholder would otherwise be required to deliver under the formula.

In order to secure Shareholder's obligations under the Agreement, Shareholder pledged to Investment Bank on the Execution Date 100 shares (that is, the maximum number of shares that Shareholder could be required to deliver under the Agreement). Shareholder effected this pledge by transferring the shares in trust to a third-party trustee, unrelated to Investment Bank. Under the declaration of trust, Shareholder retained the right to vote the pledged shares and to receive dividends.

Under the Agreement, Shareholder had the unrestricted legal right to deliver the pledged shares, cash, or shares other than the pledged shares to satisfy its obligation under the Agreement. Shareholder is not otherwise economically compelled to deliver the pledged shares. At the time Shareholder and Investment Bank entered into the Agreement, however, Shareholder intended to deliver the pledged shares to Investment Bank on the Exchange Date in order to satisfy Shareholder's obligations under the Agreement.

2003 WL 124818.

The Internal Revenue Service, based upon these stated facts, held as follows:

> Shareholder has neither sold stock currently nor caused a constructive sale of stock if Shareholder receives a fixed amount of cash, simultaneously enters into an agreement to deliver on a future date a number of shares of common stock that varies significantly depending on the value of the shares on the delivery date, pledges the maximum number of shares for which delivery could be required under the agreement, retains an unrestricted legal right to substitute cash or other shares for the pledged shares, and is not economically compelled to deliver the pledged shares.

Id.

Although petitioners concede that Revenue Ruling 2003-7 "did not discuss a borrowing of pledged shares," they assert that the borrowing that occurred in this case was irrelevant because "neither [the] borrowings nor returns of pledged shares ever deprived TAC of its 'unrestricted right' to settle the Forward Contracts at Maturity with 'cash or other shares.'" Pet. Reply Br. at 10.

The problem with petitioners' reliance on Revenue Ruling 2003-7 is that the transactions at issue in this case, considered as a whole, are different from the entirety of the transactions at issue in Revenue Ruling 2003-7. Whereas the circumstances underlying Revenue Ruling 2003-7 involved only a VPFC, in the instant case the parties entered into a series of related transactions that included not only a VPFC, but also the MSPA and the Share-Lending Agreements. The result of these related transactions was that DLJ obtained possession, and most of the incidents of ownership, of TAC's pledged shares. TAC, in turn, obtained cash payments and an elimination of any risk of loss in the pledged stock's value at the end of the term of the transactions. Thus, we conclude that petitioners' reliance

36

on Revenue Ruling 2003-7 is misplaced.

*The "safe harbor" of IRC § 1058*

Petitioners also argue that the transactions at issue are protected from immediate taxation (i.e., being treated as current sales) by what they describe as the "safe harbor" outlined in IRC § 1058.  We conclude, however, that petitioners are wrong on this point.

Section 1058 provides as follows:

(a) **General Rule.**–In the case of a taxpayer who transfers securities (as defined in section 1236(c)) pursuant to an agreement which meets the requirements of subsection (b), no gain or loss shall be recognized on the exchange of such securities by the taxpayer for an obligation under such agreement, or on the exchange of rights under such agreement by that taxpayer for securities identical to the securities transferred by that taxpayer.

(b) **Agreement requirements.**–In order to meet the requirements of this subsection, an agreement shall–
> (1) provide for the return to the transferor of securities identical to the securities transferred;
> (2) require that payments shall be made to the transferor of amounts equivalent to all interest, dividends, and other distributions which the owner of the securities is entitled to receive during the period beginning with the transfer of the securities by the transferor and ending with the transfer of identical securities back to the transferor;
> (3) not reduce the risk of loss or opportunity for gain of the transferor of the securities in the securities transferred; and
> (4) meet such other requirements as the Secretary may by regulation prescribe.

(c) **Basis.**–Property acquired by a taxpayer described in subsection (a), in a transaction described in that subsection, shall have the same basis as the property transferred by that taxpayer.

26 U.S.C. § 1058.

For the reasons we have already discussed, we conclude that the transactions at issue in this case cannot satisfy the requirements set forth in § 1058(b)(2) or (3). To begin with, the transactions at issue did not ensure that TAC would receive "amounts equivalent to all interest, dividends, and other distributions" to which TAC was otherwise entitled on the pledged stock. 26 U.S.C. § 1058(b)(2). Further, the transactions at issue effectively "reduce[d] [TAC's] risk of loss [and] opportunity for gain" in the pledged shares. 26 U.S.C. § 1058(b)(3). Indeed, as we have discussed, the transactions effectively eliminated TAC's risk of loss and substantially reduced TAC's opportunity for gain. Consequently, petitioners are not entitled to the so-called "safe harbor" afforded by § 1058.

## III

The decision of the United States Tax Court is AFFIRMED.