[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-10395

_____

Agency No. 8438-07

LIZZIE W. CALLOWAY,
ALBERT CALLOWAY,

Petitioners-Appellants,

versus

COMMISSIONER OF IRS,

Respondent-Appellee.

_____

Petition for Review of a Decision of the
U.S. Tax Court

_____

(August 23, 2012)

Before CARNES, PRYOR and RIPPLE,[*] Circuit Judges.

RIPPLE, Circuit Judge:

_____

[*] Honorable Kenneth F. Ripple, United States Circuit Judge for the Seventh Circuit, sitting by designation.

Albert and Lizzie Calloway seek review of a judgment of the Tax Court sustaining the Commissioner's determination of a deficiency, an accuracy-related penalty and a penalty for filing a delinquent tax return. For the following reasons, we affirm the judgment of the Tax Court.

# I

## A. Facts

Albert Calloway worked for IBM for a number of years and acquired IBM stock by exercising his employee stock options. During 2001, Bert Falls, the Calloways' financial adviser, introduced Mr. Calloway to a program operated by Derivium Capital, LLC ("Derivium"). Under that program, Derivium would "lend" a client ninety percent of the value of securities that the client pledged to Derivium as collateral. During the term of the non-recourse loan, Derivium had no restrictions on its use of the collateral. At the end of the loan's term, the client had three options: (1) He could reclaim the collateral by paying the principal and accrued interest; (2) He could surrender the collateral to Derivium; or (3) He could refinance. Mr. Calloway testified that the loan program was attractive to him because, had he sold his stock, he would have had to pay twenty percent in capital gains tax; under the Derivium program, however, he received ninety percent of the

stock's fair market value.

Before entering Derivium's program, Mr. Calloway consulted Falls as well as a tax advisor, who provided Mr. Calloway with a copy of a memorandum from Robert J. Nagy to Charles D. Cathcart, president of Derivium. In the memo, Nagy, who identified himself as a certified public accountant, opined that, although there were no absolute guarantees, there was a "solid basis for the position that these transactions are, in fact, loans."[1] Mr. Calloway later testified that "[i]t gave [him] comfort to know that a decision had been considered and that this was in fact a loan and not anything other, and it's a nonrecourse loan."[2] Mr. Calloway admitted, however, that he did not do any research to find out who Nagy was, that he did not know whether Nagy was associated with Derivium and that he did not "have any idea what [Nagy's] training or background [wa]s."[3]

The details of Mr. Calloway's arrangment with Derivium are set forth in three documents: "Master Agreement to Provide Financing and Custodial Services" ("Master Agreement"), "Schedule D Disclosure Acknowledgment and Broker/Bank Indemnification" ("Schedule D") and "Schedule A-1 Proper

---

[1] Ex. 27-P at 6.

[2] Tr. 39.

[3] Id. at 54.

3

Description and Loan Terms" ("Schedule A-1").

The Master Agreement provides:

> This Agreement is made for the purpose of engaging [Derivium] to provide or arrange financing(s) and to provide custodial services to the Client, with respect to certain properties and assets ("Properties") to be pledged as security, the details of which financing and Properties are to be set out in loan term sheets and attached hereto as Schedule(s) A . . . .[4]

Paragraph 3 of the Master Agreement relates to the "Funding Of [the] Loan" and

provides in relevant part:

> The Client understands that by transferring securities as collateral to [Derivium] and under the terms of the Agreement, the Client gives [Derivium] and/or its assigns the right, without requirement of notice to or consent of the Client, to assign, transfer, pledge, repledge, hypothecate, rehypothecate, lend, encumber, short sell, <u>and/or sell outright some or all of the securities</u> during the period covered by the loan.  The Client understands that [Derivium] and/or its assigns have the right to receive and retain the benefits from any such transactions and that the Client is not entitled to these benefits during the term of a loan. . . .[5]

The Master Agreement also includes a provision that allowed either party to

terminate the agreement "at any time prior to the funding of a loan."[6]

Schedule A-1 details the terms of the loan.  Specifically, the loan amount

---

[4]  Ex. 3-J at 1.

[5]  <u>Id.</u> (emphasis added).

[6]  <u>Id.</u> at 3.

4

was ninety percent of the fair market value at the time of closing; the estimated value of the collateral at that time was $105,444.90.  The interest rate to be charged was ten-and-one-half percent, compounded annually; the interest accrued until, and was due at, maturity.  Any dividends on the pledged collateral were to "be received as cash payments against interest due."[7]  The loan could not be pre-paid, and the lender could not seek recourse against the borrower, only the collateral.  The closing date was "[u]pon receipt of securities and establishment of [Derivium's] hedging transactions."[8]

Mr. Calloway executed the Master Agreement and attached schedules on August 8, 2001, and authorized the transfer of 990 shares of his IBM stock to Derivium's account with Morgan Keegan & Company, Inc., on the following day.  Cathcart, as president of Derivium, signed the Master Agreement and schedules on August 10, 2001.

On August 17, 2001, Derivium's operations office sent Mr. Calloway two documents.  The first was a valuation confirmation indicating that Derivium had received the stock, valued at $104,692.50, into its account.  The second document, titled "Activity Confirmation," indicated that, as of August 17, 2001, Derivium

---

[7] Ex. 4-J.

[8] Id.

5

had hedged the IBM stock for slightly less, $103,984.70, yielding an "Actual Loan Amount" of $93,586.23.  On August 21, 2001, Derivium sent to Mr. Calloway a letter informing him that the proceeds of the loan were sent to him according to the wire transfer instructions he had provided a few days earlier.  On the same date, $93,586.23 was credited to Mr. Calloway's credit union account.  Previously, on August 17, Derivium had exercised its right to sell the stock without giving notice to Mr. Calloway.[9]

During the period of time covered by the loan, Mr. Calloway received quarterly and year-end account statements.  Each quarterly statement set forth the loan balance at the beginning of the quarter, indicated the interest accrued during the quarter and credited the account for the dividends paid during the quarter to yield the end-of-quarter loan balance.  The statement also provided the end-of-quarter collateral value.  Mr. Calloway did not receive any tax statements reflecting dividend income (Form 1099-DIV), nor did he report on his tax returns any dividend income earned from the 990 shares of IBM stock.

In a letter dated July 8, 2004, Derivium informed Mr. Calloway that the loan

---

[9]  See, e.g., Ex. 3-J at 1 ("The Client understands that by transferring securities as collateral to [Derivium]. . ., the Client gives [Derivium] and/or its assigns the right, without requirement of notice to or consent of the client to . . . sell outright some or all of the securities . . . .").

6

would mature on August 21, 2004.  Consistent with the Master Agreement and accompanying schedules, the letter stated that Mr. Calloway could either (1) pay the maturity amount of $124,429.09 and recover his collateral, (2) renew or refinance the transaction for an additional term or (3) surrender the collateral.  On July 27, 2004, Mr. Calloway returned the response form to Derivium indicating that he was "surrender[ing his] collateral in satisfaction of [his] entire debt obligation."[10]

On February 11, 2004, Mr. Calloway and his wife filed their joint federal income tax return for the year 2001--nearly two years past the original filing deadline.  On the return, they did not report the money received from Derivium in exchange for the stock.  From the time of the loan until the surrender of the collateral in August 2004, the Calloways did not declare on their tax returns any dividend income generated by the 990 shares of IBM stock.  The Calloways also did not report on their 2004 return the surrender of their collateral to Derivium, either by declaring capital gains from the sale of securities or by declaring a forgiveness of indebtedness.

The Internal Revenue Service ("the IRS" or "the Service") issued a notice of deficiency to the Calloways for failing to include the income from the sale of the

---

[10] Ex. 13-J.

IBM stock on their 2001 income tax return.  It also assessed two penalties for failure to timely file a return and for significant understatement of income.

The Calloways filed a petition for a redetermination of income tax deficiency and penalties with the Tax Court.

**B.  Proceedings in the Tax Court**

**1.**

The Calloways framed the issues before the court in their pretrial memorandum.  They argued that the mere fact that Mr. Calloway entered into the loan agreement with Derivium to avoid paying capital gains tax was not license for the Commissioner to recast the arrangement as a sale.[11]  "In this case," the Calloways maintained, they "chose to enter into a bona fide and actual loan agreement with Derivium."[12]

The Calloways also argued that "the Commissioner [could ]not rely upon a series of events which were . . . outside of [the] Calloway[s'] control to recast the loan as a sale."[13]  According to the Calloways, the Commissioner's efforts to

---

[11]  See Pretrial Mem. for Pet'rs at 12.

[12]  Id. at 13.

[13]  Id. at 14.

8

characterize the 2001 transaction as a sale were based on Derivium's actions.  The Calloways noted that they "did not discover that the shares of stock were inappropriately sold by Der[i]vium until after 2004."[14]  It therefore "would be unfair," they continued, "to expect [them] to include the proceeds of the stock sale in their income taxes for the years that they did not, in good faith, realize such income."[15]

Finally, they maintained that "[a]ny plain reading of the Derivium loan contract demonstrates that the contract is clearly a loan agreement entered into by two independent, arms-length, unrelated parties, rather than an agreement to sell the stock pledged under the loan agreement."[16]  They claimed that this position was "further fortified by the existence of a long-standing Internal Revenue Ruling on point that was issued for the Wall Street brokerage industry,"[17] specifically, Revenue Ruling 57-451, 1957-2 C.B. 295.[18]

For its part, the IRS argued that, because the Calloways received proceeds

---

[14]  Id. at 15.

[15]  Id.

[16]  Id.

[17]  Id. at 19.

[18]  In their statement of issues, the Calloways raised questions about the basis used for the capital gains tax calculation as well as the propriety of assessing penalties against them; however, they made no specific arguments with respect to these issues in their pretrial submission.

from the sale of the stock and Derivium, in exchange, received title and possession

of the shares without any restrictions on the use of those shares, the transaction

was a sale.[19]  The Commissioner noted that the Tax Court, in Grodt & McKay

Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237-38 (1981), had enumerated

several factors to consider in determining whether a transaction should be

considered a sale for purposes of the tax laws, namely:

> (1) whether legal title passes; (2) how the parties treat the transaction;
> (3) whether an equity was acquired in the property; (4) whether the
> contract creates a present obligation on the seller to execute and
> deliver a deed and present obligation on the purchaser to make
> payments; (5) whether the right of possession is vested in the
> purchaser; (6) which party pays the property taxes; (7) which party
> bears the risk of loss or damage to the property; and, (8) which party
> receives the profits from the operation and the sale of the property.[20]

Considering those factors, the Commissioner submitted, the loan agreement

between the Calloways and Derivium should be considered a sale:

> Petitioner was required to deliver stock to Derivium Capital upon
> which Derivium Capital was obligated to deliver 90% of the value of
> the stock to petitioner.  Petitioner transferred a set number of shares
> of stock to Derivium Capital without restriction in use.  Title to the
> stock was transferred to Derivium Capital.  The amount to be
> transferred to petitioner was determined only after the stock was
> transferred to Derivium Capital and sold.  Petitioner bears no

---

[19]  See Pretrial Mem. for Resp't at 5-6 (discussing, among other cases, Hope v. Comm'r, 55 T.C. 1020 (1971), aff'd 471 F.2d 738 (3d Cir. 1973), and Provost v. United States, 269 U.S. 442 (1926)).

[20]  Id. at 6.

10

additional risk - he keeps all of the funds he received regardless of the eventual value of the stock. Petitioner has had unrestricted use of the proceeds. The petitioner gave up possession, legal title, right to receive dividends and right to vote the shares. Both petitioner and Derivium Capital treated the stock as if it belonged to Derivium Capital.[21]

The Commissioner also argued that the transaction did not meet the fundamental requirement of a loan: "a genuine intention on the part of the parties to create a debt," which is determined by looking at the facts and circumstances surrounding the purported debtor-creditor relationship.[22]  Looking at the economic realities of the transaction, the Commissioner submitted that the transaction was not a loan:

> Although the agreement between the parties to the transaction is in writing, nowhere in the agreement does petitioner promise to repay the loan. Petitioner was not required to make payments on the non-recourse loan, and petitioner never did make any payment . . . . In fact, petitioner was not allowed to make payments - principal or interest - during the term of the loan. Repayment at maturity was optional. Although the parties to the transaction refer to the transferred stock as collateral, it bears little resemblance to collateral. The transferred stock was not held to insure repayment or sold due to default or a margin requirement rather Derivium Capital sold the stock to fund the loan and to determine the amount of the loan.
>
> The parties did not conduct themselves as if the transaction

---

[21]  Id. at 6-7 (citation omitted).

[22]  Id. at 7.

11

w[ere] a loan. . . .[23]

**2.**

After receiving the parties' briefs and exhibits, and after hearing Mr. Calloway's testimony, the Tax Court rendered its decision for the Commissioner, but was not unanimous in its reasoning.

Judge Ruwe, writing for the majority, characterized "[t]he primary issue" before the court as "whether the transaction . . . was a sale or a loan."[24]  Although Mr. Calloway and Derivium had characterized the transaction as a loan in their documentation, the Tax Court observed that "'Federal tax law is concerned with the economic substance of the transaction under scrutiny and not the form by which it is masked.'"[25]

Turning first to the question of whether the transaction should be considered a sale, the Tax Court noted that, under the tax laws, "'the term "sale" is given its ordinary meaning . . . and is generally defined as a transfer of property for money

---

[23]  Id. at 8.  The Commissioner also addressed issues with respect to the Calloways' proper basis in the shares as well as the penalties the petitioners had been assessed.

[24]  Calloway v. Comm'r, 135 T.C. 26, 32 (2010).

[25]  Id. at 33 (quoting United States v. Heller, 866 F.2d 1336, 1341 (11th Cir. 1989)).

12

or a promise to pay money.'"[26]  Furthermore, the court continued, because the economic substance of the transaction is controlling, "the key to deciding whether the transaction was a sale or other disposition is to determine whether the benefits and burdens of ownership of the IBM stock passed from petitioner to Derivium."[27] This factual question "is determined from the intention of the parties as established by the written agreements read in the light of the attending facts and circumstances."[28]  The court then identified several factors that inform the inquiry:

> (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity interest in the property is acquired; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property.[29]

Applying these factors to the transaction between Mr. Calloway and Derivium led the court to conclude that Mr. Calloway had sold his stock to

---

[26]  Id. (quoting Grodt & McKay Realty, Inc. v. Comm'r, 77 T.C. 1221, 1237 (1981)).

[27]  Id.

[28]  Id.

[29]  Id. at 34 (citing Arevalo v. Comm'r, 124 T.C. 244, 252 (2005), and Grodt & McKay Realty, 77 T.C. at 1237-38).

13

Derivium in August 2001. The court first observed that legal title had passed from Mr. Calloway to Derivium: "The master agreement provide[d] that once Derivium received the IBM stock, Derivium was authorized to sell it without notice to the petitioner. Derivium immediately sold the stock. Thus, legal title . . . passed to Derivium in 2001 when petitioner transferred the IBM stock pursuant to the terms of the master agreement."[30]

Furthermore, the Tax Court continued, the parties treated the transaction as a sale. Derivium determined the amount of the "loan" only after it had determined the proceeds it would receive from the sale of the stock--a sale that, according to the terms of the Master Agreement, Mr. Calloway had authorized Derivium to make. Additionally, the Calloways did not report dividends from their purported ownership of the stock after it was surrendered to Derivium.

With respect to the equity inherent in the stock, the Tax Court believed that this factor weighed in favor of treating the transaction as a sale as well: "Derivium acquired all property interests in the IBM stock[] . . . . Petitioner retained no property interest in the stock."[31]

Finally, turning to other factors, the Tax Court determined that there was an

---

[30] Id.

[31] Id. at 35.

14

obligation on the part of Mr. Calloway to deliver and on the part of Derivium to pay for the stock, that the right of possession passed entirely to Derivium and that Derivium had the right to profit from the property during the term of the transaction.  All of these factors weighed in favor of finding that the transaction at issue was, in fact, a sale for tax purposes.

The court then turned to the separate inquiry of whether the transaction could be classified as a "loan."  The Tax Court noted that, "[f]or a transaction to be a bona fide loan[,] the parties must have actually intended to establish a debtor-creditor relationship at the time the funds were advanced."[32]  In determining whether a transaction is a loan, the economic realities of the situation, not the parties' terminology, guide the inquiry.  The Tax Court concluded that, under the facts and circumstances presented to it, there was no intent on the part of Mr. Calloway to repay the loan and no intent on the part of Derivium to secure repayment.  Specifically, the Tax Court observed:

> The transaction was structured so that petitioner could receive 90 percent of the value of his IBM stock.  Petitioner would have no personal liability to pay principal or interest to Derivium, and it would have made no sense to do so unless the value of the stock had substantially appreciated.  Petitioner transferred ownership of the stock to Derivium, who received all rights and privileges of ownership and was free to sell the stock.  Derivium did immediately

---

[32] Id. at 37 (citing Fisher v. Comm'r, 54 T.C. 905, 909-10 (1970)).

15

sell the stock and immediately passed 90 percent of the proceeds to petitioner. The only right petitioner retained regarding shares of IBM stock was an option, exercisable 3 years later, in 2004, to require Derivium to acquire 990 shares of IBM stock and deliver them to him in 2004. Petitioner[s'] right to exercise this option in 2004 was wholly contractual because he had already transferred all of the incidents of ownership to Derivium, which had immediately sold the 990 shares. Petitioner engaged in the transaction because he thought that the "loan" characterization would allow him to realize 90 percent of the value of the stock, whereas a "sale" would have netted only 80 percent of the stock's value after payment of tax on the gain. After the transfer, petitioners did not conduct themselves as if the transaction were a loan. Petitioners did not report dividends earned on the 990 shares of IBM stock on their Federal income tax returns. When petitioners decided not to "repay the loan" in 2004, they did not report a sale of the stock on their 2004 Federal income tax return and failed to report any discharge of indebtedness income. This failure was totally inconsistent with petitioners' "loan" characterization.

> . . . . In an ordinary lending transaction[,] the risk of loss to a lender is that the borrower might not repay the loan. In contrast to the ordinary risk assumed by a lender, Derivium's only risk of loss would have arisen if petitioner had actually repaid the "loan."[33]

Considering these circumstances, the Tax Court held "that the transaction was not a loan and that petitioner sold his IBM stock for $93,586.23 in 2001."[34]

The Tax Court noted that, although this was a case of first impression, two other district courts recently had held that Derivium "loans" were sales of

---

[33] Id. at 38-39 (citations omitted).

[34] Id. at 39.

16

securities.[35]  In reaching this conclusion, these courts similarly had employed the analysis set forth in Grodt & McKay Realty, 77 T.C. at 1237-38, and Welch v. Commissioner, 204 F.3d 1228, 1230 (9th Cir. 2000).[36]

Turning to the other issues raised by the Calloways, the Tax Court first rejected the Calloways' claim that, according to Revenue Ruling 57-451, they did not realize income from the transaction with Derivium until 2004 when they surrendered their rights to have Derivium return the stock.  The Tax Court quoted the ruling, which addressed the following factual scenario:

> "(2) The stockholder deposits his stock with his broker in a 'safekeeping' account and, at the time of deposit, endorses the stock certificates and then authorizes the broker to 'lend' such certificates in the ordinary course of the broker's business to other customers of the broker.  The broker has the certificates cancelled and new ones reissued in his own name."[37]

With respect to these facts, the Commissioner had determined that no disposition of the stock occurs unless the broker satisfies his obligation either with stock of a

---

[35]  See id. at 39-40 (citing Nagy v. United States, Nos. 2:08-cv-2555-DCN & 2:08-cv-2755-DCN, 2009 WL 5194996 (D.S.C. Dec. 22, 2009), and United States v. Cathcart, No. C 07-4762 PJH, 2009 WL 3103652 (N.D. Cal. Sept. 22, 2009)).

[36]  Since the Tax Court handed down its decision, the Court of Appeals for the Ninth Circuit has employed the Grodt & McKay Realty factors to evaluate whether a "loan agreement," "essentially identical" to the one at issue in this case, constituted a sale.  See Sollberger v. Comm'r, No. 11-71883, 2012 WL 3517865, at *2-3 (9th Cir. Aug. 16, 2012).   The Ninth Circuit concluded that the transaction was, in fact, a sale.  Id. at *6; see also infra at 33.

[37]  Id. at 42 (quoting Rev. Rul. 57-451, 1957-2 C.B. at 296).

17

different kind (or class) than originally was deposited, or with other property.[38]

The Tax Court concluded, however, that the 2001 transaction at issue here

> differ[ed] significantly from that described in the revenue ruling. Derivium was not acting as a broker, and the arrangement between petitioner and Derivium was not the type of securities lending arrangement described in the revenue ruling. In the revenue ruling, the stockholder authorized his broker, subject at all times to the instructions of the stockholder, to "lend" his stock to others to satisfy obligations in a short sale transaction. The "loan" in the revenue ruling required the borrower, "on demand," to restore the lender to the same economic position that he had occupied before entering into the "loan."[39]

However, the 2001 transaction did not allow Mr. Calloway to retain the benefits and burdens of being the owner of the stock; he could not terminate the loan, and he could not repay the loan before the three-year period expired.[40]

The Tax Court also observed that, "[i]n 1978[,] Congress codified and clarified the then-existing law represented by Rev. Rul. 57-451 by enacting [26 U.S.C. §] 1058."[41] As described by the Tax Court, § 1058 of Title 26 "provides for nonrecognition of gain or loss when securities are transferred under certain

---

[38] Id.

[39] Id.

[40] See id.

[41] Id. at 43 (citations omitted).

agreements."[42]   The provision requires that "the agreement must give the person who transfers stock 'all of the benefits and burdens of ownership of the transferred securities' and the right to 'be able to terminate the loan agreement upon demand.'"[43]   The Calloways, concluded the Tax Court, could not meet these requirements.

Finally, turning to the penalties, the Tax Court held that the Calloways had not met their burden of establishing that the late filing of their 2001 return was due to either reasonable cause or the absence of willful neglect.[44]   As well, the Calloways had not shown that they acted with reasonable cause and in good faith in understating their tax liability.   The Tax Court noted that the Calloways' failures both to pay taxes on the dividends reported to them by Derivium and to pay taxes for forgiveness of indebtedness in 2004 "were inconsistent with [Mr. Calloway's] version of the transaction."[45]   Furthermore, the Calloways had not relied in good faith on the advice of their financial advisor or on the Nagy memo because they had not confirmed credentials or independence with respect to

---

[42]  Id.

[43]  Id. at 44 (quoting Samueli v. Comm'r, 132 T.C. 37, 51 (2009)).

[44]  Id. at 45-46; see 26 U.S.C. § 6651(a)(1) (imposing a penalty for late filing "unless it is shown that such failure is due to reasonable cause and not due to willful neglect").

[45]  Id. at 48.

19

either source.  Thus, the Tax Court entered a decision in favor of the

Commissioner.

Judge Halpern[46] and Judge Holmes filed separate opinions.  Judge Halpern

concurred in the result, but differed with the majority on the rationale for ruling in

the Commissioner's favor.  Judge Halpern stated that the multifactor test set forth

in Grodt & McKay Realty is appropriate for non-fungible assets; "[f]or fungible

securities, however, a more focused inquiry--whether legal title to the assets and

the power to dispose of them are joined in the supposed owner"--is

determinative.[47]  Applying this rule to the Calloways, Judge Halpern opined:

> It is enough for me that petitioner gave Derivium the right and
> authority to sell the IBM common stock in question for its own
> account, which Derivium in fact did.  The nonrecourse nature of the
> petitioner[s'] obligation to repay Derivium, and almost every other
> factor considered by the majority to determine who bore the "benefits
> and burdens of ownership", is beside the point.[48]

Like Judge Halpern, Judge Holmes concurred in the result, but reached that

result through a different route.  He explained:

> Calloway and Derivium agreed to what Calloway claims was a
> nonrecourse loan secured by his stock.  In exchange for money,
> Calloway transferred control of the stock to Derivium.  Derivium sold

---

[46]  Judge Wherry agreed with Judge Halpern.

[47]  Id. at 49-50 (Halpern, J., concurring in result).

[48]  Id. at 51 (footnote omitted).

20

the stock on the open market.  The tax rules would seem to be easy to apply.  Section 1.1001–2(a)(4)(i), Income Tax Regs., provides that "the sale . . . of property that secures a nonrecourse liability discharges the transferor from the liability."  Commissioner v. Tufts, 461 U.S. 300, 308–09 (1983), and Crane v. Commissioner, 331 U.S. 1, 12–13 (1947), teach that the amount realized includes any nonrecourse liability secured by the property sold. Calloway would then have to recognize the difference between the discharged debt (i.e., the amount of the loan proceeds plus one day's accrued interest minus his basis in the stock).[49]

Although this rationale would have resolved the key substantive issue in the case, Judge Holmes continued, "[t]he majority . . . instead goes off on a frolic and detour through an inappropriate multifactor test, applies it in dubious ways, and ends up reaching an overly broad holding with potentially harmful effects on other areas of law."[50]  Judge Holmes then explained why he believes that the various Grodt & McKay Realty factors are inapplicable to the sale of stock.  For example, Judge Holmes observed that the concepts of title and possession are largely illusory with respect to publicly traded securities, a large proportion of which are held in a limited purpose trust company for the purpose of acting as a depository for its trading members.  Furthermore, Judge Holmes articulated the fear that the majority's opinion could be read as holding that "this transaction was a sale

---

[49] Id. at 53 (Holmes, J., concurring in result) (alteration in original) (parallel citations omitted).

[50] Id. at 53-54.

21

because the advance of money was nonrecourse and Derivium had the authority to sell after taking possession of the stock."[51]  Judge Holmes opined that, "[g]iven modern conditions in which a lender's authority to sell stock is routine and even necessary, the real effect of the holding would be to treat all nonrecourse lending against stock collateral as sales."[52]

### 3.

After the Tax Court issued its decision, the Calloways moved for reconsideration.  The Calloways took issue with the Tax Court's conclusion that "once Derivium received the IBM stock, Derivium was authorized to sell it without notice to petitioner."[53]  The Calloways argued that Derivium was authorized to sell the stock only "during the period covered by the loan"; the loan term was "3 years, starting from the date on which final loan proceeds are delivered on the loan transaction."[54]  According to the Calloways, when "[r]ead

---

[51]  Id. at 63.

[52]  Id.  Judge Holmes also expressed his disagreement with the way the majority applied the factors set forth in Welch v. Comm'r, 204 F.3d 1228, 1230 (9th Cir. 2000); in contrast to the majority, he believed that these factors led, at least arguably, to the conclusion that the transaction was a loan.  See infra at 36-37.

[53]  Mot. for Reconsid. of Findings of Fact and Op. at 1.

[54]  Id. at 1-2 (emphasis omitted) (internal quotation marks omitted).

22

together, these terms clearly state that Derivium's right to sell Petitioners' pledged securities does not begin until the loan funding has been fully delivered to Petitioners."[55]  The Calloways concluded that, because Derivium sold the stock on August 17, 2001, "but did not fund the loan . . . until August 21, 2001,"[56] it had breached the agreement.

The Calloways also argued that, because the court had concluded that "there was not a bona fide loan, then it is only fair and consistent that the Court should only apply those covenants of the master agreement which are effective prior to the loan period."[57]  Derivium did not have the authority to sell their stock prior to the loan period, therefore, the Calloways believed that the Tax Court could not use this fact to determine whether the transaction was a legitimate loan.  The Tax Court did not rule on the Calloways' motion to reconsider.

After considering the parties' proposed computations, the Tax Court entered its final decision as to the amount of the deficiency and penalties.  The Calloways timely appealed.

---

[55] Id. at 2.

[56] Id.

[57] Id. at 3-4.

23

## II

"We review the Tax Court's application of the tax code de novo and its findings of fact for clear error." Campbell v. Comm'r, 658 F.3d 1255, 1258 (11th Cir. 2011).

### A.  Characterization of the Transaction

#### 1.  The Grodt & McKay Realty factors

The question presented here is whether Mr. Calloway's transaction with Derivium constituted a sale of property, the gain from which should have been included in his gross income for 2001.  See 26 U.S.C. §§ 61(a)(3), 1001.  When interpreting the Internal Revenue Code, "the term 'sale' is given its ordinary meaning and is generally defined as a transfer of property for money or a promise to pay money."  Anschutz Co. v. Comm'r, 664 F.3d 313, 324 (10th Cir. 2011) (citing Comm'r v. Brown, 380 U.S. 563, 570–71 (1965)).

To determine if a sale has occurred, we ask "whether, as a matter of historical fact, there has been a transfer of the benefits and burdens of ownership." Id. (citing Grodt & McKay Realty, 77 T.C. at 1237).  Some of the factors that inform the benefits and burdens inquiry are:

(1) Whether legal title passes; (2) how the parties treat the

24

transaction; (3) whether an equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property.

Grodt & McKay Realty, 77 T.C. at 1237-38 (internal citations omitted); see also Anschutz, 664 F.3d at 324-25.[58]  "[N]one of these factors is necessarily controlling; the incidence of ownership, rather, depends upon all the facts and circumstances."  H.J. Heinz Co. & Subsidiaries v. United States, 76 Fed. Cl. 570, 582 (2007).  Some factors may be more pertinent in some situations than others, and, indeed, some factors simply may be ill-suited or irrelevant to shed light on the ownership of assets under specific circumstances.  See Sollberger v. Comm'r, No. 11-71883, 2012 WL 3517865, at *4 (9th Cir. Aug. 16, 2012) ("[W]e agree that [the Grodt & McKay Realty] criteria may be relevant in a particular case, [but] we do not regard them as the only indicia of a sale that a court may consider. Creating an exclusive list of factors risks over-formalizing the concept of a 'sale,'

---

[58]  The factors are sometimes phrased accordingly:  "(1) Whether legal title passes; (2) the manner in which the parties treat the transaction; (3) whether the purchaser acquired any equity in the property; (4) whether the purchaser has any control over the property and, if so, the extent of such control; (5) whether the purchaser bears the risk of loss or damage to the property; and (6) whether the purchaser will receive any benefit from the operation or disposition of the property."  Upham v. Comm'r, 923 F.2d 1328, 1334 (8th Cir. 1991) (quoting Houchins v. Comm'r, 79 T.C. 570, 591 (1982)); see also Arevalo v. Comm'r, 469 F.3d 436, 439 (5th Cir. 2006); Crooks v. Comm'r, 453 F.3d 653, 656 (6th Cir. 2006).

hamstringing a court's effort to discern a transaction's substance and realities in evaluating tax consequences.").

In addition to the Grodt & McKay Realty test, the Tax Court also has identified a number of factors to help determine whether a taxpayer has "transfer[red] the accoutrements of stock ownership." Anschutz v. Comm'r, 135 T.C. 78, 99 (2010), aff'd, 664 F.3d 325 (10th Cir. 2011). They are:

> (1) [w]hether the person has legal title or a contractual right to obtain legal title in the future;
>
> (2) whether the person has the right to receive consideration from the transferee of the stock;
>
> (3) whether the person enjoys the economic benefits and burdens of being a shareholder;
>
> (4) whether the person has the power to control the company;
>
> (5) whether the person has the right to attend shareholder meetings;
>
> (6) whether the person has the ability to vote the shares;
>
> (7) whether the stock certificates are in the person's possession or are being held in escrow for the benefit of that person;
>
> (8) whether the corporation lists the person as a shareholder on its tax returns;
>
> (9) whether the person lists himself as a shareholder on his individual tax return;
>
> (10) whether the person has been compensated for the amount of

26

income taxes due by reason of the person's shareholder status;

(11) whether the person has access to the corporate books; and

(12) whether the person shows by his overt acts that he believes he is the owner of the stock.

Dunne v. Comm'r, 95 T.C.M. (CCH) 1236, 1242 (2008), 2008 WL 656496, at *11 (T.C. 2008) (internal citations omitted).  As with the Grodt & McKay Realty factors, "[n]one of these factors alone is determinative," rather "their weight in each case depends on the surrounding facts and circumstances."  Dunne, 95 T.C.M. (CCH) at 1242, 2008 WL 656496, at *11.

For obvious reasons, there is significant overlap between the Grodt & McKay Realty factors that help determine whether a sale of an asset has taken place, and the Dunne factors that help determine whether, for tax purposes, an individual owns stock.  Compare, e.g., Grodt & McKay Realty, 77 T.C. at 1237 (listing first factor as "[w]hether legal title passes"), with Dunne, 95 T.C.M. (CCH) at 1242, 2008 WL 656496 at *11 (listing first factor as "[w]hether the person has legal title or a contractual right to obtain legal title in the future").  Indeed, the Dunne factors address the same question as the Grodt & McKay Realty factors--who has assumed the benefits and burdens of ownership--but tailor the terminology more precisely to the attributes of stocks and stock ownership.  For

27

instance, in Grodt & McKay Realty, the tax court identified "how the parties treat the transaction," or, slightly rephrased, whether the parties act as if a change in ownership has occurred, as a factor to consider.  77 T.C. at 1237.  In Dunne, the court specified the ways in which a party may exercise his ownership rights in stock--whether the taxpayer has the ability to vote shares and whether the taxpayer shows by his overt acts that he believes he is the owner of the stock.  See Dunne, 95 T.C.M. (CCH) at 1242, 2008 WL 656496, at *11.

Applying the Grodt & McKay Realty factors, as further refined by Dunne, to the present case, we believe that the most relevant of those factors point firmly to the conclusion that the 2001 transaction was a sale of stock for the purposes of Federal income tax.  First among those considerations is the way that the parties treated the transaction in the foundational documents.  Although denominated an agreement "To Provide Financing and Custodial Services," the terms of the Master Agreement make it clear that, during the period of time covered by the "loan," Derivium was the owner of the stock.  We previously have observed that "the characteristics typically associated with 'stock' are that it grants 'the right to receive dividends contingent upon an apportionment of profits'; is negotiable; grants 'the ability to be pledged or hypothecated'; 'confer[s][ ] voting rights in proportion to the number of shares owned'; and has 'the capacity to appreciate in

28

value.'"  See Fin. Sec. Assur., Inc. v. Stephens, Inc., 500 F.3d 1276, 1285 (11th

Cir. 2007) (per curiam) (alteration in original) (quoting Landreth Timber Co. v.

Landreth, 471 U.S. 681, 686, 105 S. Ct. 2297, 2302 (1985)).  When Mr. Calloway

transferred his securities to Derivium pursuant to the Master Agreement, he ceded

these rights of stock ownership to Derivium.  Mr. Calloway gave Derivium "the

right, without requirement of notice to or consent of the Client, to assign, transfer,

pledge, repledge, hypothecate, rehypothecate, lend, encumber, short sell, and/or

sell outright some or all of the securities during the period covered by the loan."[59]

Furthermore, Derivium was entitled "to receive and retain the benefits from any

such transactions," but "the Client [wa]s not entitled to these benefits during the

term of [the] loan."[60]  Finally, for the duration of the agreement, Derivium had the

right to vote Mr. Calloway's shares and to receive any dividends paid on those

shares.[61]  Moreover, there was no opportunity for Mr. Calloway to pay the loan

early and demand the return of his stock:  Schedule A-1 contained a "3 year

---

[59]  Ex. 3-J at 1.

[60]  Id.

[61]  See id. (listing "[v]oting shares and receiving dividends or interest on securities held as collateral" among the "services to be provided by" Derivium).

29

lockout" that prohibited prepayment of the loan before maturity.[62]  According to the terms of the parties' agreement, therefore, Derivium was treated as the owner of the stock for the duration of the loan.

When evaluated according to other Grodt & McKay Realty factors, the terms of the Master Agreement and accompanying schedules also point to the conclusion that the transaction was a sale of Mr. Calloway's stock to Derivium. The Master Agreement granted Derivium the right to possess the stock,[63] the equity in the stock, and the right to receive the profits from either holding or disposing of the stock.  As well, the nonrecourse provision of the loan ensured that, once the transaction was entered, the risk of loss passed entirely to Derivium.[64]  Applying the benefits and burdens test, therefore, we believe that the transaction between Mr. Calloway and Derivium constituted a sale of securities.

Several aspects of the transaction, especially when assessed as a totality, distinguish this arrangement from a legitimate loan.  For instance, a borrower may provide stock as collateral for a loan, and possession (or the equivalent) may be

---

[62] Ex. 4-J.

[63] Whether Derivium ever took physical possession of the stock certificates is not the relevant inquiry; it is "the right of possession" that informs the analysis.  Grodt & McKay Realty, 77 T.C. at 1237.

[64] See Ex. 4-J ("Non-recourse to borrower, recourse against the collateral only.").

transferred to the lender.  Typically, however, a lender does not have completely

<u>unfettered</u> use of the collateral--as Derivium did here--but holds the collateral in

the event of nonpayment or default.  In short, in a loan transaction, the parties do

not treat the lender as the <u>absolute</u> owner of the stock, and, concomitantly, the

lender does not exercise the <u>full</u> complement of ownership rights.

Moreover, the lockout provision, in combination with the transfer of all

rights of ownership, prevented Mr. Calloway from taking advantage of favorable

market developments during the course of the "loan."  The terms of the Master

Agreement and addenda ensured that Derivium, not Mr. Calloway, benefitted from

temporary upswings in stock price.  Derivium's absolute right to receive the

profits from disposition of the collateral for a three-year period further

distinguishes the present circumstance from a legitimate lending scenario.

Finally, the nonrecourse provision not only ensured that any risk of market

downturn was born by Derivium, but also made it unlikely that Mr. Calloway ever

would repay the loan and reclaim his collateral.  On the day Mr. Calloway entered

the agreement with Derivium, the stock would have had to appreciate significantly

before paying off the loan became an economically viable option.  In other words,

Mr. Calloway did not have an ex ante incentive to, or a strong expectation that he

31

would, pay off the loan.[65]  From his perspective, Mr. Calloway bore no risk of loss from the surrender of his stock pursuant to the Master Agreement and, therefore, was not motivated to pay back the loan as a legitimate borrower would have been.[66]

None of these factors, standing alone, necessarily would suffice to distinguish a sale from a loan or to establish that a sale of securities, as opposed to some other type of transaction, had occurred.  Nevertheless, the combination of these factors--that the parties, through the terms of the Master Agreement and addenda, treated Derivium as the owner of the stock; that Derivium, for the three-year period of the loan, had the sole right to benefit from the increase in stock price; and that Derivium, by virtue of the nonrecourse aspect of the loan and the recent performance of IBM stock, bore the burden of any likely decrease in stock price--points decidedly to the conclusion that Mr. Calloway disposed of his stock by signing the Master Agreement and addenda and retained no real interest in his

---

[65]  Indeed, as the Tax Court found, Derivium "did not expect or want" Mr. Calloway to repay the loan because, had he done so, "Derivium would have been required to acquire 990 shares of IBM stock at a cost exceeding the amount it would have received from [Mr. Calloway]." Calloway, 135 T.C. at 39.

[66]  That is not to say that a legitimate borrower would not simply surrender collateral, as opposed to repay a loan, if that collateral had experienced a steady decline in value over the life of the loan.  However, a nonrecourse loan typically is not structured in such a way that, at the outset, the borrower has little motivation to repay the loan.

32

collateral or the "loan" after Derivium had transferred the proceeds to him.

Furthermore, we note that the Court of Appeals for the Ninth Circuit took a similar approach in evaluating the tax consequences of an "essentially identical transaction[]" to the one at issue here. Sollberger, 2012 WL 3517865, at *2. Asking "whether the burdens and benefits of ownership have been transferred," and noting that the Grodt & McKay Realty factors "provide a useful starting point" for this inquiry, id. at *4, the court concluded that the taxpayers had sold their stock, thus triggering capital gains liability, id. at *6.[67]


## 2. Alternative Approaches

Three members of the Tax Court voiced their concern that the Grodt & McKay Realty factors were particularly ill-suited for determining whether Mr. Calloway's transfer of IBM stock to Derivium constituted a sale. Judge Holmes took the view in his concurring opinion that factors such as title, possession and obligation to deliver the deed may be important for determining whether cattle or land has changed hands, but were "inapt[]" for determining stock

---

[67] See supra n. 36.

ownership due to the "rapid evolution of the indirect holding system."[68]  He

observed that "[t]he Grodt & McKay [Realty] test might be helpful if the majority

adapted it to match the actual facts of this case instead of applying it without

consideration of how shares of stock differ from livestock."[69]  As our previous

discussion frankly acknowledges, and as the analysis the decision of the Tax Court

in Dunne demonstrates, the factors articulated in Grodt & McKay Realty, address

the "benefits and burdens" test at a high degree of generality and therefore require

refinement to serve as analytical tools for determining whether income has been

received by the taxpayer.  More specific articulation, tailored to the peculiar

attributes of securities, no doubt would assist accurate analysis of this question.

Nevertheless, the basic inquiry--determining whether the taxpayer enjoyed the

benefits and burdens of ownership--remains the same.  See Anschutz, 664 F.3d at

324.

     In short, employed in a measured manner, with full awareness of its

limitations, the multifactor approach employed by the Tax Court's majority

included sufficient analysis of the factual circumstances to permit our colleagues

on the Tax Court to conclude, correctly, that Mr. Calloway and Derivium had

---

[68]  Calloway, 135 T.C. at 58, 56 (Holmes, J., concurring in result).

[69]  Id. at 56.

treated the transaction in the Master Agreement and schedules as conveying all stockholder rights and liabilities, all the benefits and burdens of ownership of the stock, to Derivium.  The Calloways, in turn, realized taxable income upon consummation of the transaction.[70]

Moreover, we do not believe that the tests applied by the concurring judges provide viable alternatives to the benefits and burdens test.  Judge Halpern, joined by Judge Wherry, stated that "a more focused inquiry--whether legal title to the assets and the power to dispose of them are joined in the supposed owner--has been determinative of ownership for more than 100 years."[71] Although attractive in its simplicity, this test poses its own set of problems.  As explained by Judge Holmes, Judge Halpern's approach risks transforming, for income tax purposes, all interests secured by stock into sales of stock.[72]  Limiting the test of ownership to

---

[70] In addition to the difficulties inherent in implementing the benefits and burdens test, Judge Holmes believes that the majority's discussion of whether the transaction constitutes a loan calls into question whether any nonrecourse financing arrangements may be considered loans, as opposed to sales, for purposes of the tax laws.  See id. at 60-61 (Holmes, J., concurring in result).  We agree that the majority's alternative analysis of whether the transaction might constitute a loan, see id. at 36-38 (majority opinion), may be read in such a way.  In our own application of the benefits and burdens test, however, the nonrecourse aspect of the loan merely bolsters the conclusion--founded on other bases--that the transaction at issue constituted a sale of securities.

[71] Id. at 49-50 (Halpern, J., concurring in result).

[72] Judge Holmes stated accordingly:

(continued...)

35

title and possession risks recharacterizing as sales commercially accepted secured lending agreements.[73]

Judge Holmes's alternative analysis, we believe, contains its own infirmities. As set forth above,[74] Judge Holmes believes that, even assuming Mr. Calloway was correct that his transaction with Derivium was, in fact, a loan, Derivium's sale of the loan collateral, i.e., the securities, was a taxable event.

Characterizing the initial transaction between Mr. Calloway and Derivium as a loan, even as an assumption for the limited purpose of deciding this case,

---

[72](...continued)
Consider a true loan secured by stock. In most cases, creation of a security interest in stock is no longer delivering a physical certificate or noting the pledge on the books of the issuing corporation; it's a matter of contracting with a lender who is (as a matter of contract) allowed to sell, repledge, relend, etc. the stock involved. Under the U.C.C., in fact, a lender with a secured interest in shares of stock must obtain effective "control" over them to maintain priority--that is, he must take all steps so that he may sell the securities without further permission of the borrower. [U.C.C. art. 8] sec. 8-106 cmt. 1. One accepted way to obtain control is to have the borrower transfer his position to the lender on the books of the securities issuer or broker. Id. sec. 8-106(d)(1). When this happens, so far as the broker, the securities issuer, or the rest of the outside world is concerned, the secured party is the registered owner entitled to all rights of ownership, but the debtor remains the owner as between him and the secured party. See id. sec. 9-207 cmt. 6 (Example) (2000). This makes secured lending collateralized by securities look very similar to a sale if measured by title and possession. See, e.g., id. sec. 8-106 cmt. 4.

Id. at 57-58 (Holmes, J., concurring in result) (footnote omitted).

[73] Counsel for the Commissioner expressed the same concern at oral argument: Further limitations on the number of factors that a court may consider could jeopardize bona fide loans.

[74] See supra at n.49 and accompanying text.

36

presents substantial analytical and practical difficulties.  As discussed previously, we cannot square Mr. Calloway's wholesale transfer of ownership interests to Derivium with the idea that the transaction was a loan.  Furthermore, even if we were to agree with this characterization, Judge Holmes's approach would cause significant difficulties for taxpayers whose assets were sold without their knowledge or permission:  "Judge Holmes's test could result in understatements of income when taxpayers have absolutely no way to determine that a taxable event has occurred."[75]

Over time, it may be possible for the Tax Court to refine further its approach to analyzing the myriad of factual situations in which it must determine whether a transaction, such as the one at issue here, has resulted in the receipt of taxable income.  Indeed, it appears that this dialogue is already underway among its judges.  Nevertheless, given the wide variety of situations that the Tax Court must confront as financial arrangements become more complex and inventive, flexibility in the use of analytical tools undoubtedly will remain a necessary attribute of judicial decisionmaking.  We certainly perceive no error of law in the flexible approach followed by the Tax Court in this case.

---

[75]  Richard M. Lipton, A Divided Tax Court Treats A Stock 'Loan' As A Sale--Which Theory Should Apply?, 113 Tax'n 205, 212 (2010).

### 3. Arguments of the Calloways

Although the Calloways take issue with the Tax Court's use of the Grodt & McKay Realty factors, the crux of their argument is that the Tax Court erred in making certain factual findings that undergird its analysis.  Specifically, the Calloways take issue with two of the Tax Court's conclusions: (1) that Derivium had the right to dispose of their stock, and (2) that they were prohibited from demanding a return of their stock during the three-year lockout period.  According to the Calloways, Derivium's rights to dispose of the stock and to maintain possession of the stock for a three-year period were conditioned on the existence of a legitimate loan for tax purposes.  In the Calloways' view, because the Tax Court later determined that there was not a legitimate loan, this condition precedent was not met.

We cannot accept the Calloways' characterization of their agreement with Derivium.  Nothing in the Master Agreement or addenda required that the transaction be characterized as a "loan" by the IRS before the obligations of the parties became operative.  Furthermore, the Master Agreement contains an integration clause that states:  "There are no other representations, warranties, collateral agreements or conditions, which affect this Agreement other than as

38

expressed herein and in the attached schedules.[76]  Consequently, the fact that the Tax Court ultimately determined that the "loan" was a sale for purposes of the tax laws did not negate the transaction or undermine the legal obligations of the parties.

According to the Master Agreement, once Mr. Calloway transferred the securities to Derivium, Derivium had the right to sell his securities.  Mr. Calloway could terminate the Agreement only up until the time that the loan was funded.[77] After the loan was funded, he did not have the right to prepay or to demand the return of the collateral until the expiration of the three-year loan period.[78]  It is undisputed that Mr. Calloway authorized the transfer of securities to Derivium on August 9, 2001, and that Derivium confirmed its receipt of those securities on August 17, 2001.  Thus, the Tax Court did not err in concluding that Derivium had the right to dispose of the securities and that Mr. Calloway could not terminate the arrangement once he had received the promised funds.[79]

---

[76]  Ex. 3-J at 3 (emphasis added).

[77]  See id. ("This Agreement may be terminated by either party at any time prior to the funding of [the] loan . . . .").

[78]  See Ex. 4-J.

[79]  The Calloways also claim that they fall within the safe harbors provided by 26 U.S.C. § 1058 and Revenue Ruling 57-451.  The Calloways admit, however, that their arguments with respect to these safe harbors require that we first conclude that the Tax Court's factual findings--
(continued...)

## B. Assessment of Penalties

The Calloways also take issue with the Tax Court's assessment of accuracy-related and late-filing penalties. We shall consider each of these in turn.

### 1. Accuracy-related penalty

Section 6662 of Title 26 imposes a penalty for an underpayment of taxes "attributable to 1 or more of the following: . . . (2) Any substantial understatement of income tax." 26 U.S.C. § 6662(b). The provision defines "a substantial understatement of income tax" as one that exceeds "the greater of -- (i) 10 percent of the tax required to be shown on the return for the taxable year or (ii) $5,000." 26 U.S.C. § 6662(d)(1)(A). The Tax Court's assessment of an accuracy-related penalty is a factual determination that we review for clear error. See Patterson v. Comm'r, 740 F.2d 927, 930 (11th Cir. 1984) (per curiam). The Commissioner has the burden of production with respect to establishing liability for a penalty. See 26 U.S.C. § 7491(c) ("Notwithstanding any other provision of this title, the Secretary shall have the burden of production in any court proceeding with respect to the

[79](...continued)
that Derivium had the right to sell the transferred securities and that Mr. Calloway could not terminate the contract and demand the return of his stock--were erroneous. The Tax Court, however, did not err in reaching these conclusions. Consequently, these arguments cannot carry the day.

liability of any individual for any penalty, addition to tax, or additional amount imposed by this title."). That is, he "must come forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty." Higbee v. Comm'r, 116 T.C. 438, 446 (2001).

The Calloways do not argue that the Commissioner has not met his burden of production with respect to the penalty;[80] instead, they maintain that they fall within the "reasonable cause" exception for accuracy-related penalties set forth in 26 U.S.C. § 6664(c). Section 6664(c) provides: "No penalty shall be imposed under section 6662 or 6663 with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." The burden falls on the taxpayer to establish a reasonable cause or good faith defense. See Murfam Farms, LLC ex rel. Murphy v. United States, 94 Fed. Cl. 235, 245 (2010).

The Calloways submit that they acted in good faith and had reasonable

---

[80] The Calloways do argue that, based on Fisher v. Commissioner, 45 F.3d 396 (10th Cir. 1995), the Tax Court's imposition of the penalty was in error because, during the administrative process, the Commissioner failed to set forth his reason for imposing a penalty. Fisher has no application here. Fisher concerned 26 U.S.C. § 6661(c), now repealed, which gave the Service the discretion to "waive all or any part of the addition to tax." 45 F.3d at 397 ("The sole issue in this appeal is whether the Tax Court correctly held that the Commissioner of the Internal Revenue Service did not abuse her discretion in declining to waive the penalty for substantial understatement of tax against the Fishers."). The Calloways' penalty is premised on § 6664, which replaced § 6661 and does not contain a waiver provision.

41

cause for their underpayment because Derivium sent them quarterly updates indicating that it still owned the stock. The Calloways believe that their circumstances, therefore, are analogous to one of the examples of "reasonable cause" and "good faith" set forth in the regulations. In the example,

> E, an individual, worked for Company X doing odd jobs and filling in for other employees when necessary. E worked irregular hours and was paid by the hour. The amount of E's pay check differed from week to week. The Form W-2 furnished to E reflected wages for 1990 in the amount of $29,729. It did not, however, include compensation of $1,467 paid for some hours E worked. Relying on the Form W-2, E filed a return reporting wages of $29,729. E had no reason to know that the amount reported on the Form W-2 was incorrect. Under the circumstances, E is considered to have acted in good faith in relying on the Form W-2 and to have reasonable cause for the underpayment attributable to the unreported wages.

26 C.F.R. § 1.6664-4(b)(2), Ex. 3.

The Calloways' argument would have greater force if they, like the taxpayer in the example, had paid the taxes on the dividends that Derivium reported to them and that allegedly were being credited toward the interest on their "loan." The taxpayer in the hypothetical relied in good faith on what should have been, and what appeared to be, accurate information in calculating the tax owed. The Calloways, however, did not employ the information provided by Derivium to calculate their tax liability; they failed to declare any dividend income on their taxes during the time period of the "loan." The Calloways, therefore, cannot rely

42

on the example to establish their own reasonable cause or good faith.

The Calloways have not shown that they acted with reasonable cause and in good faith when they failed to declare their income from the sale of IBM shares to Derivium. Consequently, we affirm the Tax Court's imposition of an accuracy-related penalty.

## 2. Late-filing penalty

Finally, the Calloways believe that they should not have been assessed a late-filing penalty. Section 6012(a)(1)(A) of Title 26 requires an individual to file a tax return unless his gross income does not exceed a threshold amount. Furthermore, 26 U.S.C. § 6651(a)(1) imposes a penalty of up to twenty-five percent of the tax owed for failure to timely file a tax return "unless it is shown that such failure is due to reasonable cause and not due to willful neglect."

The Calloways maintain that they should not have been assessed a late-filing penalty "based upon [Mr. Calloway's] reliance upon the account statements that Derivium ha[d] possession of his shares through 2004."[81] They do not explain, however, how Derivium's deception with respect to the ownership of the stock affects their duty to file a tax return. They do not point to any statement

---

[81] Pet'rs' Br. 28.

43

from Derivium that suggests that they should not file, or were somehow absolved from filing, their joint return. To the contrary, the fact that Derivium was sending them statements that showed dividend income on the stock would suggest that the income should be reported. Moreover, even if they could point to such statements by Derivium, they do not suggest how relying on those statements would constitute "reasonable cause" for purposes of § 6651.

Finally, the Calloways suggest that their failure to file was inconsequential "since [they] overpaid their taxes in 2001."[82] Nevertheless, it is the taxpayers' gross income, not their tax liability, that triggers the filing requirement under 26 U.S.C. § 6012(a)(1)(A).

The Calloways have not carried their burden of establishing reasonable cause for failing to timely file their return. The Commissioner's assessment of a late-filing penalty was appropriate.

## Conclusion

For the foregoing reasons, the judgment of the Tax Court is affirmed.

**AFFIRMED.**

---

[82] Id.